No. 120,387

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Appeal of
RIVER ROCK ENERGY COMPANY
for the Year 2016 in Labette, Neosho, and Wilson Counties.

SYLLABUS BY THE COURT

1.

The Kansas Judicial Review Act (KJRA), K.S.A. 77-601 et seq., governs appellate review of rulings by the Kansas Board of Tax Appeals.

2.

Any issues before this court requiring interpretation of administrative regulations raise questions of law subject to unlimited review. Appellate courts no longer extend deference to an agency's interpretation of statutes or regulations.

3.

As a general rule, when construing tax statutes, provisions which impose a tax are to be construed strictly in favor of the taxpayer.

4.

K.S.A. 79-501 requires personal property to be appraised at its fair market value in money.

5.

K.S.A. 79-503a defines fair market value as the amount in terms of money that a well-informed buyer is justified in paying and a well-informed seller is justified in

accepting for property in an open and competitive market, assuming that the parties are acting without undue compulsion.

6.

Statutorily, oil and gas wells and leases are appraised in accordance with K.S.A. 79-331(a) and K.S.A. 79-503a in order to reach the actual fair market value in the marketplace as opposed to a fictional, unrealistic, or arbitrary determination.

7.

Substituting the minimum lease value for the working interest subtotal restricts full consideration of two factors under K.S.A. 79-331(a)—the cost of operation and the character of the market.

8.

The requirement to use the greater of the minimum lease value or the working interest subtotal (actual gross working interest value) strips the appraiser of the ability to reconcile the two values to determine a reasonable fair market value of the property.

9.

Filing fees that exceed the reasonable costs of administering an appeal amount to an unconstitutional tax and revenue-generating measure.

Appeal from the Kansas Board of Tax Appeals. Opinion filed April 10, 2020. Affirmed in part, reversed in part, and remanded with directions.

*Keith A. Brock*, of Anderson & Byrd, LLP, of Ottawa, for appellant River Rock Energy Company.

*Jay D. Befort*, deputy general counsel, and *Shelley M. Woodard*, attorney, of Legal Services Bureau, Kansas Department of Revenue, for appellee Kansas Department of Revenue.

2

*Trevor C. Wohlford*, of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Topeka, for appellees Labette, Neosho, and Wilson Counties.

Before MALONE, P.J., ATCHESON and SCHROEDER, JJ.

SCHROEDER, J.: River Rock Energy Co. (River Rock) timely appeals asking for judicial review of the Kansas Board of Tax Appeals' (BOTA) final order using minimum lease values to value its gas wells and related equipment in Labette, Neosho, and Wilson Counties (the Counties) for tax year 2016. On appeal, River Rock argues: (1) BOTA erred in upholding the Counties' valuation of certain wells based on the minimum lease values set forth in the Kansas Oil and Gas Appraisal Guide (the Guide) promulgated by the Kansas Department of Revenue's Property Valuation Division (PVD); (2) BOTA's decision led to an arbitrary and erroneous valuation of its wells; (3) BOTA's characterization of the effect of the minimum lease value is contrary to the evidence in the record; (4) BOTA's valuation of the equipment used in the wells was legally and factually erroneous; and (5) BOTA erred in refusing to grant an abatement of the filing fee and declining to docket and decide the appeals of 1,945 of River Rock's 2,150 wells. For the reasons stated below, we affirm in part, reverse in part, and remand to BOTA for further proceedings consistent with this opinion.

FACTS

In June 2016, River Rock acquired a series of producing gas wells, leases, and related assets and equipment in Kansas and Oklahoma through a bankruptcy sale. River Rock's purchase allocated $1,716,847 to the 2,150 well properties in the Counties. After taking possession, River Rock learned the Counties assigned a total appraised value of $13,522,670 to its wells, most of which had been assigned a minimum lease value in accordance with the Guide promulgated by PVD. River Rock failed in its attempts to appeal the valuations with the Counties and timely filed payment under protest

3

applications with BOTA for all 2,150 wells. But River Rock only paid the applicable filing fees for 205 of its wells despite BOTA's requirement it pay the full filing fee for each well appealed—in total, $30,900 for the 205 wells. And two of those appeals were settled while the matter was pending before BOTA. There are still 1,945 wells in limbo.

River Rock timely filed a motion requesting consolidation of the appeals and abatement of the filing fees it had paid for the 205 wells. Its motion further requested BOTA docket the appeals for its remaining wells, consolidate those appeals, and grant an abatement of the filing fees for all wells appealed after the first one. BOTA later issued an order granting the motion for consolidation of the appeals and denying River Rock's request for partial abatement of the filing fees, but its order was silent on River Rock's request to docket the additional appeals.

PVD petitioned for limited intervention—specifically, to defend against River Rock's challenges to the lawfulness of the valuation methods set forth in the Guide. BOTA granted PVD's petition. The consolidated appeal was submitted to BOTA without hearing based on prefiled written testimony, stipulated exhibits, and various briefs and written filings from River Rock, PVD, and the Counties. BOTA's final order stated the subject property consisted of 203 gas wells, and the disputed issues presented were: (1) whether the Counties' application of the Guide's minimum lease values caused an erroneous valuation of the wells contrary to Kansas law; and (2) whether the evidence presented warranted a departure from the Guide's valuation tables for certain equipment in or on the subject wells.

BOTA upheld the Counties' valuations, finding the use of the Guide's minimum lease values was legally and factually appropriate, and River Rock failed to show the evidence warranted a departure from the Guide's prescribed valuation method for each well and the valuation method for the equipment values on each well.

4

Additional facts are set forth as necessary below.

ANALYSIS

The Kansas Judicial Review Act (KJRA), K.S.A. 77-601 et seq., defines the scope of judicial review of state agency actions unless the agency is specifically exempted from applying the statute. K.S.A. 77-603(a); *Bd. of Cherokee County Comm'rs v. Kansas Racing & Gaming Comm'n*, 306 Kan. 298, 318, 393 P.3d 601 (2017). The KJRA governs appellate review of BOTA rulings. K.S.A. 74-2426(c); see K.S.A. 77-603(a). On appeal, "[t]he burden of proving the invalidity of the agency action is on the party asserting invalidity." K.S.A. 77-621(a)(1); see *In re Equalization Appeal of Wagner*, 304 Kan. 587, 597, 372 P.3d 1226 (2016).

Under the KJRA, we may only grant relief if one or more of the enumerated circumstances in K.S.A. 77-621(c) are present:

"(1) The agency action, or the statute or rule and regulation on which the agency action is based, is unconstitutional on its face or as applied;

"(2) the agency has acted beyond the jurisdiction conferred by any provision of law;

"(3) the agency has not decided an issue requiring resolution;

"(4) the agency has erroneously interpreted or applied the law;

"(5) the agency has engaged in an unlawful procedure or has failed to follow prescribed procedure;

"(6) the persons taking the agency action were improperly constituted as a decision-making body or subject to disqualification;

5

"(7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act; or

"(8) the agency action is otherwise unreasonable, arbitrary or capricious."

"[I]nterpretation of statutes and administrative regulations presents questions of law subject to do novo review. . . . And we give no deference to an agency's interpretation of its regulations." *Central Kansas Medical Center v. Hatesohl*, 308 Kan. 992, 1002, 425 P.3d 1253 (2018). As a general rule, when construing tax statutes, provisions which impose a tax "are to be construed strictly in favor of the taxpayer." *In re Tax Exemption Application of Central Illinois Public Services Co.*, 276 Kan. 612, 616, 78 P.3d 419 (2003).

I.     DID BOTA ERR IN VALUING CERTAIN WELLS BASED ON MINIMUM LEASE VALUES?

River Rock argues BOTA erred in upholding the Counties' valuations of certain wells based on the use of minimum lease values set forth in the Guide. K.S.A. 79-329 provides:

"For the purpose of valuation and taxation, all oil and gas leases and all oil and gas wells, producing or capable of producing oil or gas in paying quantities, together with all casing, tubing or other material therein, and all other equipment and material used in operating the oil or gas wells are hereby declared to be personal property and shall be assessed and taxed as such."

K.S.A. 79-501 requires personal property "shall be appraised at its fair market value in money." "'Fair market value' means the amount in terms of money that a well

6

informed buyer is justified in paying and a well informed seller is justified in accepting for property in an open and competitive market, assuming that the parties are acting without undue compulsion." K.S.A. 79-503a. "The appraisal process utilized in the valuation of all real and tangible personal property for ad valorem tax purposes shall conform to generally accepted appraisal procedures and standards which are consistent with the definition of fair market value unless otherwise specified by law." K.S.A. 79-503a. The relevant factors to consider when appraising oil and gas wells and leases for ad valorem tax purposes include:

> "the age of the wells, the quality of oil or gas being produced therefrom, the nearness of the wells to market, the cost of operation, the character, extent and permanency of the market, the probable life of the wells, the quantity of oil or gas produced from the lease or property, the number of wells being operated, and such other facts as may be known by the appraiser to affect the value of the lease or property." K.S.A. 79-331(a).

Statutorily, oil and gas wells and leases are appraised in accordance with K.S.A. 79-331(a) and K.S.A. 79-503a in order "'to reach the actual fair market value in the market place as opposed to a fictional, unrealistic, or arbitrary determination.'" *Board of Ness County Commr's v. Bankoff Oil Co.*, 265 Kan. 525, 540-41, 960 P.2d 1279 (1998). K.S.A. 79-505(a) provides:  "The director of property valuation shall adopt rules and regulations or appraiser directives prescribing appropriate standards for the performance of appraisals in connection with ad valorem taxation in this state." Relevant to this issue is PVD's procedures for oil and gas well and lease appraisals as explained in the Guide— specifically, the use of minimum lease values as an appraisal method for marginally producing wells.

As BOTA acknowledged, the Guide provides for the subtraction of certain operating costs from the working interest portion of an oil or gas lease. Most pertinent to the issues on appeal is the Guide's Gas Rendition-Schedule Value Instructions (Rendition). BOTA characterized the Guide's "'working interest minimum lease value'" as

7

"[t]he third method of expense allowance." As discussed later, River Rock challenges BOTA's characterization of the minimum lease value as a method of deducting operating expenses. However, BOTA correctly noted: "[T]he Guide allows a maximum lease operating expense allowance of 90% of the working interest value to be deducted." But is the Guide in compliance with the statutory directive for oil and gas wells to be appraised at market value? We think not.

River Rock's argument seems highly persuasive. The effect of Section VI of the Rendition is to prevent the gross working interest in any producing well from ever dropping to zero. In fact, that was the express intent of adopting the minimum lease value when the Guide was developed. If the *actual* working interest subtotal (working interest valuation minus allowable expenses) is lower than 10 percent of the working interest valuation (working interest minimum lease valuation), the minimum lease value applies. In other words, the use of the minimum lease value on limited-production wells will always create an assessed value higher than the actual gross working interest value.

This valuation method arbitrarily substitutes the higher of the two possible values to determine the gross working interest. It takes no particularly onerous leap of the imagination to envision a situation in which a gas well could be producing in *some* amount, yet the allowable expenses/deductions (operating costs, wellhead compression, and water expenses) make a zero or negative gross working interest value based on current market conditions. In fact, the record reflects at least two of River Rock's wells had negative gross working interest values—one at $-7,930 and another at $-12,790. No well-informed buyer would be justified in paying for something with zero or negative value. And no well-informed seller could conscionably entertain accepting payment for the same. Moreover, substituting the minimum lease value for the working interest subtotal restricts full consideration of two factors under K.S.A. 79-331(a)—the cost of operation and the character of the market.

8

Section VI of the Rendition determines the working interest total market value by adding the greater of the working interest subtotal or the minimum lease value to the value of certain equipment used or contained in the well. The assessed value for taxation purposes is then determined as a percentage of the working interest total market value. But this valuation is necessarily inconsistent with the fair market value of the property when the minimum lease value (Section VI, Line 6) is used in place of the actual gross working interest value (Section VI, Line 5). So the use of the minimum lease value causes an assessed valuation greater than the fair market value for the subject wells, which violates the statutory directives of K.S.A. 79-331(a) and K.S.A. 79-503a to determine the actual fair market value rather than an arbitrary value. See *Bankoff*, 265 Kan. at 540-41. Thus, BOTA's decision resulted from an erroneous interpretation or application of the law. River Rock has met its burden to show BOTA improperly applied the law and is entitled to relief under K.S.A. 77-621(c)(4).

II.     DID BOTA'S USE OF MINIMUM LEASE VALUES LEAD TO ARBITRARY AND ERRONEOUS VALUATIONS?

River Rock argues the valuation of its wells based on the minimum lease value caused an arbitrary assessment contrary to applicable statutes. River Rock divides its argument into various subpoints. For the sake of brevity and clarity, we decline to address fully its arguments on many of these subpoints as they are addressed previously in the minimum lease section. Even so, River Rock makes a persuasive argument that BOTA erred in finding the minimum lease value works along with the other valuation methods prescribed in the Guide. We agree the Guide does not allow for the proper reconciliation of market values when the working interest values and minimum lease values are so disparate.

For the benefit of the parties, we insert at this point a sample copy of the pertinent sections of the rendition statement:

9

| Section V-Gross Reserve Calculation (Total 8/8ths Interest) | Schedule (A) | Owner (B) | Appraiser (C) |
|---|---|---|---|
| 1. Annual Production - Mcf (Total Annual Prod Sec IV) | | | |
| 2. Effective Jan 1 Net Price $/Mcf (Sec II)  $  X market adjust factor  adj inc/dec | | | |
| 3. Estimated Gross Income Stream (Multiply Line 1 X Line 2) | | | |
| 4. Present Worth Factor (Based on Decline Rate-Apply Appropriate Table PWF) | | | |
| 5. Estimated Gross Reserve Value (Total 8/8ths - Multiply Line 3 X Line 4 - Transfer Total to Section VI, Lines 1 & 2) | | | |

| Section VI-Gross Reserve Value X Decimal Interest | Schedule (A) | Owner (B) | Appraiser (C) |
|---|---|---|---|
| 1. Royalty & Overriding Royalty Interest Valuation (Total Sec V, Line 5 X Total RI & ORRI Interest)  X | | | |
| 2. Working Interest Valuation (Total Sec V, Line 5 X Total WI Interest)  X  X  (Tbl B Water Cr Adj) | | | |
| 3. Deduct Operating Cost Allowance for Producing Well (Allowance per Tbl) | | | |
| 4a. Deduct Wellhead Compression (Annual Compression Expense)  X  (Expense Factor-Tbl) | | | |
| 4b. Deduct Water Expense Allowance (Tbl A Annual Exp; Tbl B Annual Exp if Actual)  X  (Expense Factor-Tbl) | | | |
| 4c. Deduct Water Expense Allowance Table C per SWD Well (Deduct SWD Expense for each Prod Well if SWD System) | | | |
| 5. Working Interest Subtotal (Sec VI, Line 2 minus Lines 3, 4a,4b & 4c) | | | |
| 6. Working Interest Minimum Lease Value (Sec VI, Line 2)  X  10% | | | |
| 7. Copy Value from Sec VI, Line 5 or Line 6 (Whichever Line is Greater) | | | |
| 8a. Add Prescribed Equipment Value for Producing Well (Flowing $/Well)  (Pumping $/Well) | | | |
| 8b. Add Prescribed Equipment Value for Non-Producing Well (Shut-In, TA,SWD-Add SWD Equip Value for each Prod Well if SWD System) | | | |
| 8c. Add Pres Equip Value for Additional Equipment (Compressors,Gathering Lines,etc...)  X  (Equip Fact-Tbl) | | | |
| 9. Add Itemized Equipment (Section III - Attached Schedule) | | | |
| 10. Working Interest Total Market Value (Add Sec VI, Lines 7, 8a, 8b, 8c, & 9) | | | |
| 11. Working Interest Total Assessed Value (Multiply Sec VI, Line 10 X 30%, Unless Lease Qualifies for 25% Rate) | | | |

This form also will be helpful as we discuss the lines involving the proper methodology for appraising all the equipment used in and on the wells at issue.

As River Rock points out, the Uniform Standards of Professional Appraisal Practice (USPAP) guidelines describe reconciliation as a process in which the appraiser analyzes two different conclusions based on alternative valuation methods and weighs the appropriateness of each approach to determine the correct value based on the intended use of the appraisal. River Rock's citation to the USPAP guidelines is persuasive and well founded as USPAP appraisal methodologies have consistently been cited approvingly by Kansas appellate courts in the context of other ad valorem tax appraisals. See generally *In re Equalization Appeal of Kansas Star Casino*, 52 Kan. App. 2d 50, 65-66, 362 P.3d 1109 (2015).

10

Line 7 of Section VI of the Guide instructs the appraiser to use "whichever line is greater" of either Line 5 (working interest subtotal) or Line 6 (minimum lease value) of Section VI. This renders the two options mutually exclusive. Deductions for *actual* costs and other expense allowances are no longer factored into the working interest total market value when the minimum lease value is used instead of the working interest subtotal. Instead, this allowance is capped at 90 percent of the unadjusted working interest value by substituting the minimum lease value, which is contrary to the proposition a tax statute is to be strictly construed in the favor of the taxpayer. See *Central Illinois Public Service Co.*, 276 Kan. at 616. Line 7 of Section VI prevents the appraiser from engaging in a proper reconciliation analysis because it requires the higher of the two values be used. This does not allow for sufficient consideration and reconciliation of the two values consistent with the intent of the appraisal—to determine the fair market value of the property. See K.S.A. 79-331(a); K.S.A. 79-503a. Rather, it reflects an intent to produce a desired result—always using the higher value, increasing the assessed value and the resulting ad valorem tax levied.

Deducting 90 percent of the unadjusted working interest value under the minimum lease value may seem like a hefty allowance for expenses. Even so, the resulting gross working interest based on the minimum lease value may still be a significant amount, i.e., hundreds or even thousands of dollars. Yet, River Rock presented unrebutted evidence that actual expenses can and do create wells with zero or negative gross working interest values. Here, the record reflects the previously mentioned wells with negative gross working interest values were assigned minimum lease values of $4,908 and $4,422, respectively. No well-informed buyer would be justified in paying hundreds, much less thousands, of dollars for something with a zero or negative value. The requirement to use the greater of the minimum lease value or the working interest subtotal (actual gross working interest value) strips the appraiser of the ability to reconcile the two values to determine a reasonable fair market value of the property. BOTA's decision reflects an erroneous interpretation or application of the law, factual findings unsupported by the

11

record, and/or an otherwise arbitrary action. Thus, River Rock has met its burden to show it is entitled to relief under K.S.A. 77-621(c)(4), (7), and/or (8).

III.    WAS BOTA'S CHARACTERIZATION OF THE EFFECT OF THE MINIMUM LEASE VALUE CONTRARY TO THE EVIDENCE?

River Rock argues BOTA incorrectly characterized the minimum lease value as a method of deducting operating expenses. In a very narrow sense, River Rock is partially correct; however, its argument is ultimately unpersuasive. BOTA's characterization is perhaps better labeled as an over-simplification of the evidence and the operative effect of the Guide's use of minimum lease values, which apply when the deductions allowed for costs and expenses in Lines 3 and 4 of Section VI exceed 90 percent of the unadjusted working interest value from Line 2. The minimum lease value allows for deduction of expenses, albeit incidentally. Before assigning the minimum lease value, the appraiser must calculate the working interest subtotal, which considers the actual expense allowances. Since the minimum lease value applies when it is greater than the working interest subtotal, deductions for some, but not all, operating expenses and other allowances are implicitly considered.

Based on the comparison required by Line 7 of Section VI, it appears BOTA correctly characterized the minimum lease value as a method of deducting operating expenses equal to 90 percent of the working interest value. This result still leads to an effective deduction of operating expenses, albeit in a lesser amount than the actual expenses incurred. River Rock's argument is unavailing because it is essentially a distinction without a difference. Nevertheless, resolving this issue is unnecessary based on our holding the use of minimum lease values is legally erroneous.

12

IV.    DID BOTA ERR IN VALUING THE EQUIPMENT IN THE WELLS?

River Rock argues its wells were incorrectly appraised based on the prescribed equipment values applied to the wells. River Rock asserts it presented undisputed evidence that the true fair market value of its equipment was $0.00. Specifically, River Rock argues the Counties' valuation of the equipment was unsupported by the record.

To determine the assessment value of the wells for taxation, the working interest total market value (Line 10) is calculated by adding the greater of the working interest subtotal or the minimum lease value (Line 7) to the value of certain equipment used as part of or contained within the well (Lines 8a-c and 9), then multiplying the working interest total market value by a prescribed percentage. The equipment in the wells valued in Line 8a consisted of (1) a pumping unit with motor; (2) a gas separator; (3) tubing and rods situated in the well bore; and (4) an insert pump situated in the well bore. River Rock relies on the following testimony of its expert witness, Jim Allen:  "'As a result of River Rock's decision to plug and abandon *a large number of unprofitable wells*, I have made a very extensive effort . . . to sell the equipment *associated with such wells*.'" (Emphasis added.) This testimony is problematic for many reasons. First, the equipment in question is only that associated with the unprofitable wells. While Allen stated there were a large number of unprofitable wells, it is unclear how many of River Rock's wells were unprofitable, and of those unprofitable wells, how many were included in the 203 appeals BOTA actually decided in its order.

Second, River Rock fails to acknowledge the significance of the reason the wells were unprofitable. Allen testified:

"The Subject Wells are very shallow, marginal [coalbed methane] wells and producing conditions associated with these wells are very unique to southeast Kansas and northeast Oklahoma. . . . In addition, with the *low natural gas prices* that have been prevalent *over*

13

*the last few years*, there have been very few, if any, new [coalbed methane] wells drilled in this area. . . . [T]he narrow market for this equipment combined with *the current market conditions* has rendered this equipment worthless *at this time*." (Emphases added.)

Allen also stated the removal and sale of the equipment was typical "[w]hen River Rock *temporarily* abandons a well prior to plugging the well." (Emphasis added.)

Allen's testimony points to several market conditions that are subject to change and is generally unrelated to the condition or usefulness of the equipment within its intended application. Mainly, Allen's testimony shows natural gas prices affect the value of the equipment if it is designed for use in shallow, marginally producing wells. Nothing in Allen's testimony suggests these wells would be unprofitable if the price of natural gas went up, much less that the equipment itself is or would be unsuitable for use as market conditions improved. To the contrary, it seems the equipment is particularly suited to the unique nature of the subject wells. It is the marginal production capacity of *the wells* coupled with the *current price of natural gas* that renders *the wells* unprofitable *at this time*. But these factors are separately accounted for in Section V (Gross Reserve Calculation) and Lines 2 through 7 of Section VI of the Rendition.

River Rock is trying to tie the value of the equipment to variable market conditions in a manner that could lead to drastic swings in its value from year to year. But this would largely render meaningless general market principles that the value of equipment will depreciate over time based on age, wear, and obsolescence. Under River Rock's proposed valuation, its equipment might be considered more valuable five years from now than it was five years ago. Moreover, Allen's testimony suggests River Rock was only temporarily abandoning the wells, supporting a reasonable inference that River Rock believed the wells' reserves were sufficient to produce in profitable quantities given an increase in natural gas prices. Allen's testimony that the equipment is specifically intended for use in shallow coalbed methane wells supports another reasonable inference

14

that the same or substantially similar equipment could or would be used if the market price of natural gas improved, thus, making the wells profitable in the future.

Finally, River Rock fails to point to any record evidence regarding the age of the equipment; its original value; the general depreciation of its value over time; the most recent value of the equipment before the decline in natural gas prices; an estimate of the equipment's value in its present condition without the decline of natural gas prices; anything suggesting River Rock's wells or similar wells could not produce in paying quantities despite a potential favorable change in market conditions, i.e., the wells' reserves were already exhausted; or any evidence on the relative stability of natural gas prices over time.

River Rock failed to establish the equipment's current condition coupled with its remaining economic livelihood and the likely duration of continuing market conditions would render it valueless to a well-informed buyer or a well-informed seller. Among other factors, K.S.A. 79-331(a) requires consideration of "the character, extent *and permanency* of the market." (Emphasis added.) River Rock fails to account for or consider the permanency of the market conditions supporting its *current* proposed valuation of the equipment.

Simply put, a well-informed buyer might be justified in declining to purchase otherwise serviceable equipment for which it has no *presently* profitable *use*. Even so, a well-informed buyer would not be justified in expecting to pay nothing for the same equipment when its present condition could render its use profitable with reasonably probable changes in market conditions. Similarly, a well-informed seller would not be justified in accepting nothing in return for otherwise serviceable equipment with ongoing economic viability given a favorable change in market conditions.

15

Here, River Rock failed to show either its equipment was already of minimal value in its present condition or the existing market conditions rendering its present use unprofitable were likely to persist so as to render the equipment obsolete or unserviceable by the time any favorable change in market conditions might occur. BOTA properly rejected River Rock's valuation on the basis the evidence presented was "scant" and "insufficient." River Rock has not met it burden to prove BOTA's valuation of the equipment was improper except as explained below.

However, River Rock's argument on imputing the values in Line 8b of certain segments of underground poly flow lines used to connect the gas wells to a separate saltwater disposal well (SWD) is persuasive. River Rock presented uncontested evidence the flow lines connected to the SWD could not be physically salvaged without destroying them. Even if they could be salvaged, the cost to remove the lines would far exceed any salvage value. And River Rock presented undisputed testimony there exists no market for used SWD flow line because it is inexpensive to produce in new condition and no prudent operator would purchase and install used flow line due to the potential for costly leaks. If the value of the SWD flow lines was included in the working interest total market value (Line 10), BOTA's decision affirming the Counties' valuations of the subject wells was based on a finding of fact made or implied without proper support in the record and/or resulted from an arbitrary failure to consider undisputed evidence. Thus, whatever value was added for the SWD flow lines must be subtracted out and River Rock is entitled to relief under K.S.A. 77-621(c)(7) and/or (8) by reducing the total equipment value.

V.    DID BOTA ERR BY REFUSING TO GRANT FILING FEE ABATEMENTS?

River Rock argues BOTA erred in refusing to grant an abatement of any portion of the filing fees paid and refusing to docket the appeals for its remaining wells. The Counties contend we lack jurisdiction to consider the issue. The Counties first argue we

16

cannot consider the denial of abatement under the KJRA because (1) it is an administrative order, not an adjudicative order, and (2) BOTA cannot be joined as a party to this action and therefore cannot properly participate in a matter in which it has a direct and substantial interest. The plain language of K.S.A. 74-2438a(a) matches our Supreme Court's guidance in *Kansas Bldg. Industry Workers Comp. Fund v. State*, 302 Kan. 656, 674-75, 359 P.3d 33 (2015) (regulatory measures intended to reimburse the State for the costs related to administrative measures and proceedings are valid if such fees are reasonable in relation to the actual costs involved). The propriety of BOTA's decision turns on whether it erroneously interpreted or applied the regulation or engaged in an unlawful procedure or failed to follow prescribed procedures. These questions are properly within the scope of review under the KJRA. See K.S.A. 77-621(c)(4) and (5).

The Counties further argue we lack jurisdiction because River Rock did not seek judicial review within 30 days of BOTA's order consolidating the docketed appeals. For consolidation, BOTA's order stated: "The Board . . . finds the Taxpayers' Motion for Consolidation of Appeals is granted, and the appeals referenced in the motion shall be consolidated." There is significant ambiguity in the meaning of "the appeals referenced in the motion." BOTA's order could be interpreted to mean it would docket the additional appeals but would not grant any abatement of the filing fee already paid. The order also failed to provide the required notice under K.S.A. 77-613(e).

The Counties' argument is unpersuasive because BOTA's consolidation order was unclear on whether it would consider the motion as a notice of appeal for the additional wells, which River Rock had specifically requested. On its face, the order provided no definitive indication that BOTA was dismissing any additional appeals for which the filing fees had not been paid. At best, this could be loosely inferred from the caption of the order, listing only the originally docketed appeals. There is no clear indication in the record that BOTA declined to docket and consider the additional appeals outside its final order. Because BOTA's order on River Rock's motion for consolidation and abatement

17

violated the final order notification provisions of K.S.A. 77-613(e), it did not trigger the 30-day limit to seek judicial review under the KJRA. See *Heiland v. Dunnick*, 270 Kan. 663, 673, 19 P.3d 103 (2001). But the merits of River Rock's arguments cannot be fully determined by us at this time. We must remand for further findings.

Without abatement, the filing fee for all 2,150 wells using the full filing fee in the amount of $150 per well would have been $322,500. River Rock filed notices of appeal and paid the full filing fees for 205 of its wells—$30,900—and filed a motion for consolidation of appeals and abatement of the filing fees for all the wells after payment of the full filing fee for the first well on appeal. The matter was decided on prefiled written testimony and stipulated exhibits. No evidentiary hearing took place, and River Rock's challenge to the valuation of nearly all its wells presented the same legal argument because nearly all of its wells had been assigned minimum lease values under the Guide. From this record, we cannot differentiate between those wells with minimum lease values and those with some other valuation, if any. The 2016 taxes for all of River Rock's wells were $487,723.75; thus, the full filing fee would have amounted to slightly more than 66 percent of the total taxes; in our opinion, it seems excessive and fiscally unsound to require a taxpayer to pay such a large amount to exercise the right to appeal.

Filing fees that exceed the reasonable costs of administering the appeals amount to an unconstitutional tax and revenue-generating measure. See *Kansas Bldg. Industry Workers Comp. Fund*, 302 Kan. at 674-75. K.A.R. 94-5-8(e)(2) provides for abated filing fees for property comprising a single economic unit. The prescribed abated filing fee should have been $150 for the most valuable well plus $25 for each additional well. However, this would have required a filing fee of $53,875 ($150 + [$25 x 2,149]) for all 2,150 wells. Neither BOTA nor River Rock fully complied with the applicable administrative regulation. Either BOTA potentially overcharged River Rock by up to $25,650 for the appeals it docketed ($30,900 – [$150 + (204 x $25)]), or River Rock underpaid by $22,975, making 919 wells for which it failed to pay the abated filing fee

18

([$53,875 - $30,900] x [1 well/$25]). But strict adherence to the abated filing fee provisions under K.A.R. 94-5-8(e)(2) may be still inappropriate if it leads to payment of filing fees above the reasonable costs of administering the proceedings. See *Kansas Bldg. Industry Workers Comp. Fund*, 302 Kan. at 674-75.

In its motion, River Rock requested BOTA also docket appeals on its remaining wells, construe the motion as notice of appeal for those wells, consolidate the additional appeals with those already filed, and grant an abatement of the filing fee for the additional appeals. River Rock's motion did not state what it believed it should pay as an abated filing fee for the additional appeals. While BOTA granted the motion to consolidate the appeals but denied the request for abatement, the order did not reflect whether BOTA would docket and consider the appeals on the additional wells. It could reasonably be construed that BOTA would docket the additional appeals but decline to grant any abatement of the filing fees already paid by River Rock as a result. BOTA's order provided no meaningful explanation for why it was denying an abatement. It simply stated it had charged such fees in the past and was allowed to do so under its own regulations. This does not answer the pertinent question—whether the fee was reasonable in relation to the actual costs involved.

We have jurisdiction to consider the abatement issue, generally, pursuant to K.S.A. 77-621. Even so, the record appears insufficient to determine how much, if any, the filing fees should have been abated, although it seems extremely unlikely the costs for deciding this consolidated appeal reached or exceeded $30,900. When it moved for consolidation and abatement, River Rock was still within the time limit for filing notices of appeal on its remaining wells. BOTA's final order fails to explain why it refused to docket the remaining appeals. BOTA cited no regulation(s) about the form of the notice of appeal as a basis for dismissing any additional appeals. Strictly following K.A.R. 94-5-8(e)(2), the filing fees River Rock paid could have covered appeals for some, but not all, of its additional wells. But it is unclear what the actual administrative costs were for the

19

docketed appeals and what additional costs, if any, BOTA would have incurred if it docketed all of the well appeals with an abated fee of $25.00 after the first and most valuable well. BOTA's own regulation provides for the abatement, and the facts of this appeal seem to fit the reason abatement is provided for in BOTA's regulations. The issues on appeal appear to be identical or nearly identical for each well—the proper appraisal method for the wells and related equipment.

At this point, the issue need not be fully decided on the merits. We remand for BOTA to explain its decision. BOTA's reasoning for denying abatement was simply: "The Board further finds it has consistently charged filing fees in the past, as it has in this matter, and as allowed by its regulations."

Further explanation on remand allows BOTA to elaborate on the basis for its decision. It cannot simply prescribe and enforce regulations related to filing fees to generate revenue or because it has imposed them in the past. BOTA does not have a substantial and direct interest in the collection of filing fees simply to charge and collect whatever amount it deems appropriate. BOTA's regulatory authority is not unlimited. Rather, it is constrained by K.S.A. 74-2438a(a), which authorizes the director of BOTA to charge and collect a filing fee "to recover all or part of the costs of processing such actions incurred by the state board of tax appeals."

If BOTA's decision turned on a conclusion that it lacked jurisdiction to consider River Rock's additional appeals, then we have subject matter jurisdiction to review BOTA's conclusion as to its own jurisdiction. See *Wall v. Kansas Dept. of Revenue*, 54 Kan. App. 2d 512, 514, 401 P.3d 670 (2017). But BOTA's findings in its consolidation order and its final opinion are insufficient to determine whether its decision hinged on a jurisdictional determination. Thus, we remand for more findings before BOTA for what remedy, if any, BOTA has to address River Rock's request for abatement.

20

CONCLUSION

Based on our findings, we affirm BOTA's valuation of the equipment used on and in the wells, except the value of the poly pipe as explained below to determine the working interest value, but we reverse and remand for BOTA to make the following determinations:

- Whether the request to docket and consolidate the additional appeals was denied because of: (1) the form of the notice of appeal used by River Rock; (2) River Rock's failure to pay the filing fees in full for all 2,150 wells; or (3) River Rock's failure to pay the correct amount assuming the full filing fee had only been assessed for the first most valuable well and abated for each of the other 2,149 wells under K.A.R. 94-5-8(e)(2).

- Whether: (1) abatement is feasible under these facts; (2) BOTA should have allowed abatement of the filing fee for the docketed appeals to $25.00 per well after payment of the full filing fee for the first most valuable well; and (3) the request by River Rock to docket the additional appeals in its motion for consolidation and abatement sufficiently preserved the issue for all wells not contained in the initial order of consolidation.

- If BOTA determines abatement is not feasible, it must explain what additional administrative costs, if any, were incurred to support denial of the request to abate.

- What additional filing fee, if any, River Rock must pay to docket appeals for any wells not docketed in the order of consolidation, explaining what additional administrative costs, if any, will be incurred.

21

- Reassessment of all wells subject to this appeal without the use of the minimum lease value because the current valuation deviates from applicable law.

- Remove the valuation for the poly pipe used in the SWD flow lines in each of the wells subject to this appeal because it has no economic life left and is, therefore, worth nothing when considering the individual well values.

- Follow the previous valuation used for the other equipment in and on each of the wells subject to this appeal as reflected on line 8a of Section VI.

Without BOTA's determination of whether abatement should have been allowed under these facts and whether the actions of River Rock sufficiently preserved its right to appeal on all 2,150 wells, we cannot fashion what, if any, other remedy is available to River Rock.

Affirmed in part, reversed in part, and remanded with directions.