IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 120,387

In the Matter of the Appeal of RIVER ROCK ENERGY COMPANY
for the Year 2016 in Labette, Neosho, and Wilson Counties.

SYLLABUS BY THE COURT

1.

Article 11, § 1 of the Kansas Constitution requires the Legislature to "provide for a uniform and equal basis of valuation and rate of taxation of all property subject to taxation."

2.

In Kansas, oil and gas leases are assessed and taxed as personal property for ad valorem taxation.

3.

K.S.A. 79-1439(a) specifies that personal property subject to general ad valorem taxation must be appraised uniformly and equally at its fair market value as defined in K.S.A. 79-503a.

4.

Under K.S.A. 79-503a, the appraisal process used in the valuation of all tangible personal property for ad valorem tax purposes must conform to generally accepted appraisal procedures that are consistent with the definition of fair market value, unless otherwise specified by law.

5.

Under K.S.A. 79-331(a), when determining the value of oil and gas leases or properties, the appraiser must consider the age of the wells; the quality of oil or gas being produced therefrom; the nearness of the wells to market; the cost of operation; the character, extent, and permanency of the market; the probable life of the wells; the quantity of oil or gas produced from the lease or property; the number of wells being operated; and such other facts as may be known by the appraiser to affect the value of the lease or property.

6.

Ad valorem taxation of oil and gas leases differs from that of most other personal property in that the assessment is based on the present worth of the lease's future production. The determination of the fair market value of a lease necessarily requires consideration of the expected future income potential, including the age and probable life of producing wells thereon.

7.

K.S.A. 79-1456 requires a county appraiser, when establishing values for various types of personal property, to conform to the values for such property shown in the personal property appraisal guides prescribed or furnished by the Director of Property Valuation. But the county appraiser may deviate from the values shown in such guides on an individual piece of personal property for just cause shown and in a manner consistent with achieving fair market value. In this context, "just cause" means a legally sufficient reason to deviate from the guide value for a particular property to more accurately reflect its fair market value.

8.

For valuation purposes, the continued existence of an oil and gas lease on January 1 in a given tax year is an acknowledgment by the lessee that the lease has some marketplace value to that lessee. Otherwise, the lease would have been abandoned. And even if this is not always the case, a lessee who believes some exceptional circumstances exist remains free to present the county appraiser with those circumstances to consider deviation under K.S.A. 79-1456(b).

9.

Under K.S.A. 77-613(b), a petition for judicial review of a final order of an agency action must be filed within 30 days of service of that order.

10.

The notice provisions in K.S.A. 77-613(e) require strict compliance.

Review of the judgment of the Court of Appeals in 58 Kan. App. 2d 98, 464 P.3d 344 (2020). Appeal from the Kansas Board of Tax Appeals. Opinion filed August 6, 2021. Judgment of the Court of Appeals affirming in part and reversing in part the Board of Tax Appeals and remanding the case with directions is affirmed in part and reversed in part. Decision of the Board of Tax Appeals is affirmed in part and reversed in part, and the case is remanded with directions.

*Keith A. Brock*, of Anderson & Byrd, LLP, of Ottawa, argued the cause and was on the briefs for appellant River Rock Energy Company.

*Shelley M. Woodard*, of the Legal Services Bureau, Kansas Department of Revenue, argued the cause and *Jay D. Befort*, deputy general counsel, and *William E. Waters*, of the same office, were with her on the briefs for appellee Kansas Department of Revenue.

*Trevor C. Wohlford*, of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Topeka, argued the cause and was on the briefs for appellees Labette, Neosho, and Wilson Counties.

*Jay Hall*, general counsel, Kansas Association of Counties, was on the brief for amicus curiae Kansas Association of Counties.

The opinion of the court was delivered by

BILES, J.: For tax purposes, state law requires oil and gas properties to be appraised uniformly and equally at fair market value. Toward that end, the law mandates county appraisers adhere to the Kansas Oil and Gas Appraisal Guide developed by the Kansas Department of Revenue's Property Valuation Division unless just cause is shown for deviation. This court long ago acknowledged the complexities this entails. See, e.g., *Cities Service Oil Co. v. Murphy,* 202 Kan. 282, 288, 447 P.2d 791 (1968) ("[T]he valuing of producing oil leases in compliance with K.S.A. 79-331, setting out eight factors, which must be considered as well as any other factors known by the assessor to affect the valuation of the property, is an extremely difficult operation.").

Here, River Rock Energy Co. advances a multi-jurisdictional dispute over valuations given for the 2016 tax year to its working interests in 203 gas wells and related equipment. It claims the division's Guide produced inflated values for their producing gas leases by capping operating expense allowances to arrive at what is known as a "working interest minimum lease value"—an appraisal methodology used in Kansas for more than 50 years to account for the market values of working interests in marginally producing properties. See *Board of Ness County Commr's v. Bankoff Oil Co.*, 265 Kan. 525, 541, 960 P.2d 1279 (1998) ("Ad valorem taxation of oil and gas leases differs from that of most other personal property in that the assessment is based on the present worth of the lease's future production.").

In deciding River Rock's challenge, the Board of Tax Appeals and a Court of Appeals panel disagreed about applying the Guide's working interest minimum lease

4

values for these wells. See *In re Tax Appeal of River Rock*, 58 Kan. App. 2d 98, 464 P.3d 344 (2020). BOTA held River Rock "failed to provide evidence establishing just cause to deviate from the *Guide*'s provisions." The panel, on the other hand, held the Guide overvalued River Rock's wells and "reflects an intent to produce a desired result—always using the higher value, increasing the assessed value and the resulting ad valorem tax levied." 58 Kan. App. 2d at 106. On review, we agree with BOTA when it upheld the county appraisers' application of the Guide.

As to the remaining issues, we affirm BOTA's decision to use the Guide's values for well-site equipment on River Rock's leases. We also affirm the Court of Appeals decision that it had jurisdiction to entertain River Rock's challenge to BOTA's order refusing to abate filing fees for this multi-property protest appeal. We remand the case to BOTA for further proceedings consistent with the panel's directions on the fee abatement issue, although we acknowledge this may be of little practical benefit to River Rock given our rulings on the merits.

FACTUAL AND PROCEDURAL BACKGROUND

River Rock, a subsidiary of Cardinal River Energy Co., acquired through an expedited bankruptcy sale a collection of producing gas wells, leases, and related assets and equipment located across eight different taxing districts in southeast Kansas and northeast Oklahoma. This included 2,150 well properties in Montgomery, Labette, Neosho, and Wilson Counties. River Rock's president testified the bid price for all the assets was $3,100,000. The record reflects $1,716,847 of that amount was allocated to the Kansas well properties.

Before the sale, the respective county appraisers had separately appraised the working interests and equipment in the 2,150 well properties for tax year 2016 at

5

$13,522,670 in accordance with statutory timelines. Of those, 2,094 working interests were valued using the minimum lease value methodology specified in the Guide's 2016 edition. After its acquisition, River Rock filed county-level payments under protest for all 2,150 properties to contest the valuations. See generally K.S.A. 79-2005(a) (protesting payment of taxes).

With the counties, River Rock claimed the valuations using the Guide's minimum lease values were invalid estimates of fair market value. It asserted its $1.7 million bankruptcy-sale purchase price conclusively established fair market value, even though the sale occurred months after the statutorily designated January 1 valuation date. It supplied each county with documents from the bankruptcy sale including its credit-bid allocation for each well property and written summaries about the bankruptcy's circumstances. But it submitted no other property-specific information about additional allowable operating expenses or other analytical data to allow the counties to individually reconsider a particular well's valuation. See K.S.A. 79-1456(b) ("The county appraiser may deviate from the values shown in such guides on an individual piece of personal property for just cause shown and in a manner consistent with achieving fair market value.").

Ultimately, each county appraiser independently upheld using the Guide after concluding River Rock offered insufficient evidence to assign a credible alternative value for any specific property. Each appraiser disregarded River Rock's bankruptcy purchase-price allocation after concluding it was not a valid indication of fair market value. See K.S.A. 79-2005(a) ("The county appraiser shall review the appraisal of the taxpayer's property with the taxpayer . . . and may change the valuation of the taxpayer's property, if in the county appraiser's opinion a change in the valuation of the taxpayer's property is required to assure that the taxpayer's property is valued according to law."). Unsatisfied, River Rock continued with its objections.

River Rock filed payment-under-protest applications for all 2,150 Kansas properties with BOTA, but paid filing fees only for 205. Of those, two settled. River Rock moved to consolidate all appeals and abate the outstanding unpaid fees. BOTA agreed to consolidation, but it denied the filing fee abatement. BOTA considered "perfected" only those protest appeals with paid filing fees. This left 203 appeals for adjudication across three counties: Labette, Neosho, and Wilson. The remaining wells were "in limbo" as the Court of Appeals panel later characterized it. *River Rock*, 58 Kan. App. 2d at 100.

BOTA permitted David N. Harper, Director of the Property Valuation Division for the Kansas Department of Revenue, to intervene to defend the Guide. All parties submitted written testimony and exhibits and agreed to waive witness cross-examination. They also filed suggested findings of fact and conclusions of law along with supporting briefs.

Lynn L. Kent, PVD's Oil and Gas Personal Property Section Manager, testified for the division. She described the Guide's development and methodologies, and explained the theoretical basis for the working interest minimum lease value:

> "The appraisal opinion reflected in the 2016 Guide regarding 'Working Interest Minimum Lease Value' *is an opinion that a working interest in a producing oil or gas lease has value and is not worthless. It is an appraisal opinion that the working interest has a minimal market value, in addition to the remaining equipment, if the lease is producing.*
>
> "*Restated, in context, the Guide reflects an appraisal opinion for 2016 that the expense allowance should not exceed more than 90% of the working interest's gross*

7

*reserve value for producing gas properties.* Although it is termed 'working interest minimum lease value,' it is really one of three considerations of expenses in the working interest value calculation." (Emphases added.)

Kent also testified the Guide's working interest minimum lease value, when added to the remaining equipment value, does not violate "any applicable Uniform Standards of Professional Appraisal Practice (USPAP) provision" if the lease is producing. See K.S.A. 79-505(a)(1) (requiring "all appraisals be performed in accordance with generally accepted appraisal standards as evidenced by the appraisal standards promulgated by the appraisal standards board of the appraisal foundation").

The counties provided testimony from their respective county appraisers. Each testified: (1) they were ultimately responsible for the valuations given on the subject wells; (2) they followed the policies, procedures, and guidelines from PVD; (3) the taxpayer provided no property-specific information or analysis to allow the county to perform a more detailed alternative evaluation; (4) they did not deviate from the Guide in appraising the subject properties, even though the Guide authorizes individual deviations; and (5) there was no just cause to deviate from the Guide's working interest minimum lease value provisions for these wells.

River Rock provided its evidence through three witnesses: Jay Jimerson, president of River Rock and Cardinal; Michael Begland, a petroleum engineer; and James Allen, vice president of operations for River Rock and Cardinal. River Rock's principal thrust was that the Guide methodologies did not consider all costs of operations when using the minimum lease value method. Jimerson testified a discounted cash flow method—the approach the Guide uses when the minimum lease value is not applied—was the industry standard for valuing oil and gas properties and should be used in Kansas. Begland testified that during periods of low gas prices, it is not unusual for a gas well's expenses

8

to be near or exceed the well's gross reserve value. He said if one considered the additional costs of plugging and remediation, such wells would not have a minimum value and would instead be considered a liability in the marketplace. Allen testified about equipment values.

Before final submission to BOTA, River Rock clarified it no longer was contending—as it had before the counties—that the bankruptcy sale established fair market value for its wells. Instead, it based its argument solely on the working interest minimum lease value's function in the Guide's calculation when used for low producing wells. River Rock also argued its evidence supported deviating from the Guide to value its equipment at $0.

BOTA rejected River Rock's appeals. It reasoned: (1) the Guide's methodology for valuing oil and gas leases does not ignore operational costs, as River Rock claimed, so by using the Guide the counties properly considered all statutory factors when determining individual lease valuations; (2) River Rock's evidence did not provide a sufficient alternative basis to determine fair market value on any individual well as required by K.S.A. 79-1456 (authorizing county appraisers to deviate from Guide values); and (3) River Rock's preferred valuation methodology for well equipment was like a "value in use" approach that could result in vastly different appraisals for identical equipment based only on that equipment's use or situs. River Rock appealed.

*The Court of Appeals decision*

A Court of Appeals panel affirmed in part and reversed in part. It held: (1) BOTA erred as a matter of law by upholding the county appraisers' use of the Guide's "working interest minimum lease value," because that method caused appraised valuations greater than the statutorily mandated fair market value; (2) BOTA's use of the minimum lease

9

values rendered its decision erroneous and arbitrary; (3) BOTA incorrectly assigned value to saltwater disposal lines when calculating the total equipment values on the rendition form; (4) BOTA properly valued the remaining equipment in accordance with the Guide; and (5) BOTA failed to adequately explain its refusal to abate filing fees for River Rock's appeals. It remanded the filing fee abatement question for BOTA to reconsider. *River Rock*, 58 Kan. App. 2d at 104, 106-07, 110-11, 114.

PVD and the counties asked for this court's review. River Rock filed a conditional cross-petition for review on the equipment valuation question. We granted review on all issues. Jurisdiction is proper. See K.S.A. 20-3018(b) (providing for petitions for review of Court of Appeals decisions); K.S.A. 60-2101(b) (Supreme Court has jurisdiction to review Court of Appeals decisions upon petition for review).

ANALYSIS

Although BOTA's decision affects only the three counties where the subject property is located—Labette, Neosho, and Wilson—the panel's more sweeping invalidation of the Guide's methodology is of general importance to the oil and gas appraisal process statewide, especially as it concerns low producing properties. PVD advises that in 2019 gas wells producing 100 mcf or less had an assessed value of $116,323,908. See 2019 Statistical Report of Property Assessment and Taxation (March 2020).

Our focus is on the valuation of River Rock's "working interest" in these wells under the gas leases it acquired. A working interest is also described as the operating interest. It includes the right to extract the gas and is burdened with the costs of development and operation of the property. See *Reynolds-Rexwinkle Oil, Inc. v. Petex, Inc*., 268 Kan. 840, 846, 1 P.3d 909 (2000); *Mulsow v. Gerber Energy Corp*., 237 Kan.

10

58, 61, 697 P.2d 1269 (1985) ("The lessee's share of the oil and gas lease is termed the 'working interest.' It is the lessee's interest in oil and gas produced after deduction of the royalty paid to the landowner. The working interest owner bears the expense of exploration, drilling, and producing oil or gas.").

We organize our analysis by first explaining the standard of review and then describing the process for valuing these wells and equipment before considering the specific questions at hand. As would be expected, the issues overlap across the petitions for review, so hopefully this framework avoids some duplication.

*Standard of review*

The Kansas Judicial Review Act controls judicial review of BOTA decisions. See K.S.A. 74-2426(c). River Rock, as the party seeking to invalidate BOTA's action, must prove that invalidity. K.S.A. 77-621(a)(1). The KJRA permits judicial relief only for the reasons enumerated in K.S.A. 77-621(c). The Court of Appeals panel held four subsections authorized the relief it granted:  (c)(4) (agency erroneously interpreted or applied the law), (5) (agency engaged in an unlawful procedure or failed to follow prescribed procedures), (7) (agency action unsupported by record), and (8) (agency action otherwise arbitrary and capricious). *River Rock*, 58 Kan. App. 2d at 106, 111. A court's standard of review depends on the subsection at issue.

Judicial review of an agency's interpretation and application of the law is permitted under K.S.A. 77-621(c)(4) and is unlimited without deference to the agency's view. *Via Christi Hospitals Wichita, Inc. v. Kan-Pak*, 310 Kan. 883, 890, 451 P.3d 459 (2019); *May v. Cline*, 304 Kan. 671, 675, 372 P.3d 1242 (2016); *Douglas v. Ad Astra Information Systems*, 296 Kan. 552, 559, 293 P.3d 723 (2013) (rejecting the doctrine of deference to an agency on questions of law). Similarly, interpretation of the Guide's

11

binding effect is a question of law, subject to unlimited judicial review. *Board of Leavenworth County Comm'rs v. McGraw Fertilizer Serv., Inc.*, 261 Kan. 901, 917, 933 P.2d 698 (1997) ("[T]he question of whether assessment schedules promulgated by the Director conform to a statute is a question of law not finally determinable by the Director.").

When interpreting a statute, we begin with its plain language, giving common words their ordinary meaning. If a statute is plain and unambiguous, we do not speculate about the legislative intent behind that clear text. But if the statutory language is ambiguous, we will consult our canons of construction to resolve the ambiguity. *Johnson v. U.S. Food Service*, 312 Kan. 597, 601, 478 P.3d 776 (2021). "When construing tax statutes, statutes that impose the tax are to be construed strictly in favor of the taxpayer. Tax exemption statutes, however, are to be construed strictly in favor of imposing the tax and against allowing the exemption for one who does not clearly qualify." *In re Tax Exemption Application of Central Illinois Public Services Co.*, 276 Kan. 612, 616, 78 P.3d 419 (2003).

On issues alleging BOTA failed to follow prescribed procedures to entitle relief under K.S.A. 77-621(c)(5), our review is unlimited because those questions necessarily involve interpretation of relevant statutory or regulatory procedures.

As to whether BOTA's decision was based on factual determinations unsupported by the record as required for relief under K.S.A. 77-621(c)(7), a reviewing court must determine whether the evidence supporting the agency's factual findings is substantial when considered "in light of the record as a whole." K.S.A. 77-621(d) defines substantial evidence "'in light of the record as a whole'" to include evidence both supporting and detracting from an agency's findings. But if BOTA's findings of fact are determined to be so supported, "the findings cannot be disregarded or contradicted on appeal." *In re CIG*

*Field Services Co.*, 279 Kan. 857, Syl. ¶ 2, 112 P.3d 138 (2005); see also K.S.A. 77-621(d) ("[T]he court shall not reweigh the evidence or engage in de novo review.").

Finally, as to whether BOTA's decision was "otherwise unreasonable, arbitrary or capricious" as required for relief under K.S.A. 77-621(c)(8), we review those questions for abuse of the agency's discretion. See *Via Christi Hospitals*, 310 Kan. at 891 (subsection [c][8] "'determines the reasonableness of the agency's exercise of discretion in reaching its decision'").

*Oil and gas taxation*

Article 11, § 1 of the Kansas Constitution requires the Legislature to "provide for a uniform and equal basis of valuation and rate of taxation of all property subject to taxation." State law specifies personal property subject to ad valorem taxation is to be appraised uniformly and equally at its fair market value. See K.S.A. 79-501; K.S.A. 79-1439(a). And K.S.A. 79-329 requires oil and gas leases and wells that are producing or capable of producing oil or gas in paying quantities, "together with all casing, tubing or other material therein, and all other equipment and material used in operating the oil or gas wells," to be assessed and taxed as personal property. *Bankoff*, 265 Kan. at 538. As noted earlier, our court has long recognized the complexity of this undertaking for oil and gas properties. *Cities Service Oil Co.*, 202 Kan. at 288.

For this appeal, state law defined "fair market value" in tax year 2016 in pertinent part as:

"[T]he amount in terms of money that a well informed buyer is justified in paying and a well informed seller is justified in accepting for property in an open and competitive market, assuming that the parties are acting without undue compulsion. In the determination of fair market value of any real property which is subject to any special

13

assessment, such value shall not be determined by adding the present value of the special assessment to the sales price. For the purposes of this definition it will be assumed that consummation of a sale occurs as of January 1.

"Sales in and of themselves shall not be the sole criteria of fair market value but shall be used in connection with cost, income and other factors including but not by way of exclusion:

. . . .

"(d) depreciation, including physical deterioration or functional, economic or social obsolescence;

. . . .

"(f) productivity taking into account all restrictions imposed by the state or federal government and local governing bodies, including, but not limited to, restrictions on property rented or leased to low income individuals and families as authorized by section 42 of the federal internal revenue code of 1986, as amended;

"(g) earning capacity as indicated by lease price, by capitalization of net income or by absorption or sell-out period;

. . . .

"(i) sale value on open market with due allowance to abnormal inflationary factors influencing such values; [and]

. . . .

"(k) comparison with values of other property of known or recognized value. The assessment-sales ratio study shall not be used as an appraisal for appraisal purposes.

14

"The appraisal process utilized in the valuation of all real and tangible personal property for ad valorem tax purposes shall conform to generally accepted appraisal procedures which are adaptable to mass appraisal and consistent with the definition of fair market value unless otherwise specified by law." K.S.A. 2015 Supp. 79-503a.

We note in passing the Legislature amended K.S.A. 79-503a, effective July 1, 2016, to delete the phrase "adaptable to mass appraisal" in the last quoted paragraph. L. 2016, ch. 112, § 9. But neither the parties, BOTA, nor the panel mention this revision as being significant to their arguments, and we see no relevance with it to our holdings.

Our law makes each January 1 the valuation date for the subject wells. See K.S.A. 79-503a. To accomplish timely tax processing, on or before April 1 of each year oil and gas lease owners, as well as those engaged in operating for oil or gas, must file with the appropriate county appraiser a "statement of assessment" on a form prepared or approved by the Director of Property Valuation "to elicit the information necessary to fix the valuation of the property." K.S.A. 79-332a(a), (c). The one-page form at issue here is entitled a "Gas Assessment Rendition." See attached Table. The county appraiser then must send taxpayers notices by May 1 stating the property's classification and appraised valuation. K.S.A. 79-1460(a). For the 2016 tax year, all this occurred before River Rock's June bankruptcy acquisition. *River Rock*, 58 Kan. App. 2d at 99-100. And we note the counties appraised each gas well as an individual operating unit.

K.S.A. 2015 Supp. 79-331 governed these valuations for the 2016 tax year. It stated in pertinent part:

"(a) Except as otherwise provided in subsection (b) of this section, in determining the value of oil and gas leases or properties the appraiser shall take into consideration the age of the wells, the quality of oil or gas being produced therefrom, the nearness of the wells to market, the cost of operation, the character, extent and permanency of the

15

market, the probable life of the wells, the quantity of oil or gas produced from the lease or property, the number of wells being operated, and such other facts as may be known by the appraiser to affect the value of the lease or property.

. . . .

"(d) *In order to clarify and express the intent of the legislature regarding the methodology utilized in the determination of fair market value of producing oil and gas leases for property tax purposes, it is hereby declared that the primary and predominant consideration in such determination is, has been and shall be the actual value of oil and gas production severed from the earth*." (Emphasis added.)

In *Bankoff*, this court explained:

"*The determination of the fair market value of a lease necessarily requires consideration of the expected future income potential of a lease, including the age and probable life of producing wells thereon.* This methodology primarily arose out of the efforts of Dr. Charles F. Weinaug, a professor of petroleum engineering at the University of Kansas and a consultant to the Kansas Department of Revenue. This method was approved by our court in *Cities Service Oil Co. v. Murphy,* 202 Kan. 282, 447 P.2d 791 (1968)." (Emphasis added.) *Bankoff*, 265 Kan. at 541.

Further noting this court had thoroughly reviewed state laws for oil and gas valuation in *State ex rel. Stephan v. Martin*, 230 Kan. 747, 641 P.2d 1011 (1982), the *Bankoff* court observed: "While not specifically so stating, [*Martin*] in effect *upheld the entire statutory method of valuing oil and gas properties*." (Emphasis added.) *Bankoff*, 265 Kan. at 540-41.

Under state law, the Director of Property Valuation has general supervision over property taxation matters for all Kansas counties. K.S.A. 79-1404; see also *McManaman v. Board of County Comm'rs*, 205 Kan. 118, 126, 468 P.2d 243 (1970) ("[T]he legislature saw fit to vest ultimate supervisory responsibility for the administration of the assessment and tax laws of the state squarely on the director of property valuation with attending enforcement power and authority.").

Our statutory scheme also delineates the respective roles for the Director and county appraisers. For example, K.S.A. 75-5105a(d) requires the Director to "[a]ssist county appraisers and district appraisers to determine the fair market value in money of nonstate assessed properties, *the valuation of which requires specialized technical knowledge*." (Emphasis added.) Similarly, K.S.A. 75-5105a(b) requires the Director to "[d]evise or prescribe guides, or both, for the valuation of personal property." And K.S.A. 79-505(a) provides: "The director of property valuation shall adopt rules and regulations or appraiser directives *prescribing appropriate standards for the performance of appraisals in connection with ad valorem taxation in this state*." (Emphasis added.) For the county's part, K.S.A. 79-1456(b) requires:

> "The county appraiser in establishing values for various types of personal property, shall conform to the values for such property as shown in the personal property appraisal guides prescribed or furnished by the director of property valuation. The county appraiser may deviate from the values shown in such guides on an individual piece of personal property for just cause shown and in a manner consistent with achieving fair market value."

The guides are mass appraisal tools that have been lawfully used for several decades, have not previously been held to violate Kansas statutes or regulations, and have

been judicially approved. *Bankoff*, 265 Kan. at 529, 544. This court long ago observed that

> "the ideal method of valuation would be for each individual item of personal property to be separately examined and valued according to its actual physical condition and the prevailing market price for a similar item in similar condition. *It is obvious that such a system would be totally impractical and expensive to the point of being confiscatory and self-defeating. Some appropriate method of mass valuation must be utilized even though individual inequities will result. The adoption of trending indices and their application to broad categories of property is an appropriate method of valuation so long as the results reasonably approach fair market value and the constitutional requirement of a 'uniform and equal rate of assessment and taxation.'"* (Emphasis added.) *In re Tax Appeal of Horizon Tele-Communications, Inc.*, 241 Kan. 193, 200, 734 P.2d 1168 (1987).

In the 1960s, PVD determined the large number of oil and gas properties needed an appropriate methodology for more uniform appraisal. The Guide was developed for that purpose and its propriety for valuing oil and gas wells accepted by this court. See *Bankoff*, 265 Kan. at 541, 544; cf. *Cities Service Oil Co. v. Murphy*, 202 Kan. 282, 447 P.2d 791 (1968). The Guide's practicality is obvious since state law allows only a month for appraisers to determine the classification and value of oil and gas leases and properties after the taxpayers' deadline for submitting their rendition forms. See K.S.A. 79-332a(a), (b); K.S.A. 79-1460(a).

As for the 2016 Kansas Oil and Gas Appraisal Guide that is the subject of this dispute, BOTA's findings explained:

> "The Guide provides a mass appraisal methodology for valuing a universe of oil and gas properties developed by the PVD director, with consultation from Kansas County Appraisers and representative[s] of the oil and gas industry including company officials,

18

tax consultants, attorneys, accountants, geologists, petroleum engineers and software programmers.

"The Guide's mass appraisal methodology is designed to value a large number of similar type properties in a uniform and consistent manner in an effort to achieve fair market value for ad valorem tax purposes. Standard guidelines and models using common data are used to value a universe of properties as of a given date. The goal is to provide a common valuation method that achieves a reasonable estimate of the fair market value for the most oil and gas properties. In accordance to Kansas statute, the Guide also allows for consideration of other factors and other valuation methods, if necessary, to achieve fair market value, for an individual piece of property."

Even so, as BOTA noted, the Guide is not the last word on an individual well's valuation. Echoing K.S.A. 79-1456(b), the Guide expressly states in boldface in its foreword that after conforming to the values set out: "The county appraiser may then deviate from such guidelines on individual properties for just cause and in a manner consistent with establishing market value in accordance with the state statutes."

Our caselaw has not defined "just cause" as used in K.S.A. 79-1456(b) or the Guide. But the meaning reflected by the term's application in other contexts is apt. See *State v. Wohlfort*, 123 Kan. 62, 68, 254 P. 317 (1927) ("The term 'just cause' cannot be defined with absolute accuracy, and may arise from any cause or combination of causes or circumstances."); *Gorham v. City of Kansas City*, 225 Kan. 369, 373, 590 P.2d 1051 (1979) ("'The word "cause" . . . means what is sometimes spoken of as legal cause, or just cause, a substantial, reasonable or just cause, related to matters of a substantial nature pertaining to duties or obligations imposed.'"); cf. Black's Law Dictionary 274 (11th ed. 2019) (defining "good cause" as "[a] legally sufficient reason. Good cause is often the burden placed on a litigant [usu. by court rule or order] to show why a request should be granted or an action excused. The term is often used in employment-termination cases.

19

Also termed *good cause shown*; *just cause*; *lawful cause*; *sufficient cause*."). And in the context of whether an insurance company has just cause to deny a claim, we have said the company must have "a bona fide and reasonable factual ground for refusing to pay." *Clark Equipment Co. v. Hartford Accident and Indemnity Co.*, 227 Kan. 489, 494, 608 P.2d 903 (1980). The duty in question here is to determine the fair market value of a given oil and gas property, so "just cause" would mean a legally sufficient reason to deviate from the Guide value for a particular property to more accurately reflect its fair market value.

The Guide's 2016 edition comprises 102 pages of schedules, tables, maps, definitions, and procedures formulated to estimate fair market value in various scenarios. Its parameters are updated annually through a statutory rulemaking procedure requiring input from industry and governmental representatives with specialized expertise in the field. Before finalizing the 2016 edition, PVD held its annual session with industry stakeholders to discuss appraisal adjustments—including the working interest minimum lease value—in September 2015. See K.S.A. 75-5105a(b) ("In the preparation of such guides, the director of property valuation shall confer with representatives of the county appraisers and district appraisers, and shall seek counsel from official representatives of organized groups interested in and familiar with the value of classes of property with which they are concerned."); cf. *State ex. rel. Stephan v. Martin*, 227 Kan. 456, 463, 608 P.2d 880 (1980) ("In the absence of evidence to the contrary, the Director is presumed to have followed the statutory requirements.").

The Guide's methodology includes tables taking property location into account. Coalbed methane gas fields—where the gas leases at issue here are located—have their own table. It splits out the entire lease value to value separately the royalty, overriding royalty, and the combined working interests. The working interest portion is directed to subtract operating costs by using one of three methods. The third method—known as the

20

"working interest minimum lease value"—applies when costs under the first two methods approach the Guide-estimated baseline value. This lies at the heart of our controversy. In her BOTA testimony, Kent described the mechanics:

> "For gas leases, the guide allows a maximum lease operating expense allowance of 90% of the working interest value to be deducted. If the applicable Table expense allowance or the excess allowance together with the wellhead compression and [saltwater disposal lines] expenses allowances (Lines 3, 4a and 4c) is greater than 90% of the working interest value, which may happen with low producing or minimal leases, then the Guide method uses an expense allowance equal to 90% of the working interest value.

> "Once cost allowances are deducted from the working interest portion of the lease, value for equipment used for production is added to establish the working interest total market value."

As BOTA recognized, the working interest minimum lease value approach "*is an opinion* that a working interest in a producing oil or gas lease has not reached its economic limit and retains market value beyond the contributory value of the on-site equipment." (Emphasis added.) This is consistent with K.S.A. 79-329's directive that "all oil and gas leases and all oil and gas wells, *producing or capable of producing oil or gas in paying quantities . . .* are hereby declared to be personal property and shall be assessed and taxed as such." (Emphasis added.) And it is further reinforced by our caselaw acknowledgment that ad valorem taxation of oil and gas leases "differs from that of most other personal property in that the assessment is based on the present worth of the lease's future production." *Bankoff Oil Co.*, 265 Kan. at 541.

The Guide's suitability to its task of valuing producing oil and gas properties is bolstered by some general understandings about the relationship between an oil and gas lessor and lessee. Recall that the value to the lessee in the working interest comes from

21

the right given to extract the reserve now or in the future. But if the lessee's willingness to pursue production wanes—either because of an inability to operate profitably or just a lack of commitment to continue operation—the lease can be abandoned by that lessee. See *Rook v. James E. Russell Petroleum, Inc.*, 235 Kan. 6, 14, 679 P.2d 158 (1984) ("In the usual oil and gas lease the appellant concedes under Kansas law the lease would terminate by its own terms when further production of the lease by the lessee was abandoned by reason of unprofitable production."); *Wilson v. Holm*, 164 Kan. 229, 237, 188 P.2d 899 (1948) (permanent cessation of profitable production terminates the lease); 2 Kuntz, Law of Oil and Gas §§ 26.8(a) & (c), 26.13(c) (2021) ("The shut-in royalty clause is, of course, designed to modify the habendum clause, and the lease will remain in force and effect, although there is no marketing of production, if the shut-in royalty payments are made.").

This reality gives us an assurance for valuation purposes that the continued existence of an oil and gas lease on January 1 in a given tax year is an acknowledgment by the lessee that this lease has some marketplace value to that lessee. Otherwise, the lease would have been abandoned. And even if this is not always the case, a lessee who believes some exceptional circumstances exist remains free to present the county appraiser with those circumstances under K.S.A. 79-1456(b) to consider deviation. In any event, as a general proposition we can reasonably conclude PVD's judgment to use a minimum lease value reflects the attitude of actual market participants toward leases existing on the valuation date for producing wells or those capable of producing in paying quantities. See K.S.A. 79-329.

Against this backdrop, we turn to whether BOTA erred when applying the governing statutes, particularly K.S.A. 79-331(a) and K.S.A. 79-503a, and in upholding the Guide's minimum lease values to appraise River Rock's working interests. We also

22

must consider whether BOTA's decisions based on the Guide were supported by the evidence and were reasonable.

*BOTA's use of the Guide's minimum lease values*

The panel held BOTA improperly applied the law by approving the county appraisers' use of the working interest minimum lease value methodology, entitling River Rock to relief under K.S.A. 77-621(c)(4) (erroneous interpretation or application of the law). It held as a matter of law that the Guide does not comply with the statutory directive for oil and gas wells to be appraised at fair market value. *River Rock*, 58 Kan. App. 2d at 103-04. The panel explained its thinking:

> "The effect of Section VI of the Rendition is to prevent the gross working interest in any producing well from ever dropping to zero. In fact, that was the express intent of adopting the minimum lease value when the Guide was developed. If the *actual* working interest subtotal (working interest valuation minus allowable expenses) is lower than 10 percent of the working interest valuation (working interest minimum lease valuation), the minimum lease value applies. In other words, the use of the minimum lease value on limited-production wells will always create an assessed value higher than the actual gross working interest value.

> "This valuation method arbitrarily substitutes the higher of the two possible values to determine the gross working interest. It takes no particularly onerous leap of the imagination to envision a situation in which a gas well could be producing in *some* amount, yet the allowable expenses/deductions (operating costs, wellhead compression, and water expenses) make a zero or negative gross working interest value based on current market conditions. In fact, the record reflects at least two of River Rock's wells had negative gross working interest values—one at $-7,930 and another at $-12,790. No well-informed buyer would be justified in paying for something with zero or negative value. And no well-informed seller could conscionably entertain accepting payment for the same. Moreover, substituting the minimum lease value for the working interest

23

subtotal restricts full consideration of two factors under K.S.A. 79-331(a)—the cost of operation and the character of the market.

> "Section VI of the Rendition determines the working interest total market value by adding the greater of the working interest subtotal or the minimum lease value to the value of certain equipment used or contained in the well. The assessed value for taxation purposes is then determined as a percentage of the working interest total market value. But this valuation is necessarily inconsistent with the fair market value of the property when the minimum lease value (Section VI, Line 6) is used in place of the actual gross working interest value (Section VI, Line 5). So the use of the minimum lease value causes an assessed valuation greater than the fair market value for the subject wells, which violates the statutory directives of K.S.A. 79-331(a) and K.S.A. 79-503a to determine the actual fair market value rather than an arbitrary value." 58 Kan. App. 2d at 103-04.

The flaws in this reasoning are readily apparent based on the background previously discussed. Most obviously, the panel advances its own view that what it calls "actual gross working interest value" (which is the Rendition's Section VI, line 5, "Working Interest Subtotal") better represents fair market value of an operator's working interest in a gas reserve, before considering equipment value, than the Guide's minimum lease value. 58 Kan. App. 2d at 104. The panel apparently believed a working interest the lessee has chosen to retain in a well not currently producing or capable of producing in *profitable* quantities, using the Guide's formula, has no fair market value other than that ascribed to well-site equipment. But where is the legal basis for this? There is none that we can see.

To begin with, there is no caselaw to buttress the panel's undoing of a valuation methodology that has been a feature of oil and gas taxation in this state for more than 50 years. The panel, in effect, substitutes the Guide's *predicted profitability* of a well in a given year for the statutory directive to tax all wells producing or capable of producing *in*

24

*paying quantities*. Those are not the same thing. See K.S.A. 79-329; *Bankoff*, 265 Kan. at 541 ("The determination of the fair market value of a lease necessarily requires consideration of the expected future income potential of a lease, including the age and probable life of producing wells thereon."); *Cities Service Oil Co.*, 202 Kan. at 294-95 (upholding oil and gas valuation schedules developed by Dr. Weinaug); *Martin*, 227 Kan. at 463 (Director presumed to have followed the statutory requirements). In other words, the panel would use the Guide up to a point, and then abandon it to reach a $0 fair market value for the lease reserve.

The panel reasoned "substituting the minimum lease value for the working interest subtotal restricts *full* consideration of two factors under K.S.A. 79-331(a)—the cost of operation and the character of the market." (Emphasis added.) *River Rock*, 58 Kan. App. 2d at 104. But the statute does not require "full" consideration, nor does the panel even explain what "full" consideration entails. K.S.A. 79-331(a) simply requires the enumerated criteria be considered with the aim of achieving fair market value. And only one factor is given special statutory status: "that the primary and predominant consideration in such determination is, has been and shall be *the actual value of oil and gas production severed from the earth*." (Emphasis added.) K.S.A. 79-331(d). So from that viewpoint, the Guide's methodology is sensible because it prevents the Guide's estimated operating expenses from overriding the present worth of the working interest's share of future production for wells producing or capable of producing in paying quantities. The panel reads more into the statute for two of the eight factors than is there.

Similarly, the panel's preferred way to value marginal wells cannot come from the record because BOTA concluded River Rock offered no substantial credible evidence to support its claim that the Guide's methodology ignores operational costs. See *In re CIG Field Services Co.*, 279 Kan. 857, Syl. ¶ 2, 112 P.3d 138 (2005) (when BOTA findings of fact are supported by substantial competent evidence "the findings cannot be disregarded

25

or contradicted on appeal"). And the record itself substantiates the Guide's approach because it details how the Guide was developed, as BOTA noted, "with consultation from Kansas County Appraisers and representative[s] of the oil and gas industry including company officials, tax consultants, attorneys, accountants, geologists, petroleum engineers and software programmers." See K.S.A. 75-5105a(b). BOTA concluded,

"The uncontroverted testimony from Lynn Kent, PVD Oil and Gas and Personal Property Section Manager[,] indicates that the Guide's prescribed rules, formulas, and tables capture all items and factors mandated in K.S.A. 79-331. The Counties herein, through utilization of the Guide's methodologies for valuation of the subject wells, have properly considered all of these factors based on the evidence presented by [River Rock]."

BOTA also held:

"The *Guide* specifically provides various methodologies for consideration of proper expenses, including operational costs, before a final determination, based on one of the various *Guide* methodologies, can be made through the process of reconciliation. *The Board finds that these expense methodologies do not operate independently, as alleged by [River Rock]. They instead work in conjunction with one other and collectively, along with other formulas, comprise the Guide's scheme for considering operational costs.*" (Emphasis added.)

And BOTA reinforced its holdings by detailing the Guide's methodology in its factual findings:

"The Guide's mass appraisal method is an income approach which determines the income by multiplying the prior year's production by the prior year's net weighted average price. The net weighted average price is multiplied by a market adjustment factor, as determined by PVD, to adjust the prior year's net weighted average price per lease to the current year's estimated market conditions. The net weighted average price is net of gathering, transportation, and conditioning expenses. These expenses are taken out

26

of the price rather than as a lease expense allowance to affect all interests included in the entire lease value. This results in a gross income value, which is then multiplied by a present worth factor, that is determined from the lease's decline rate, to estimate the gross reserve value. The estimated gross reserve value is the present value of the entire lease inclusive of all interests. The entire lease value is then split to separately value the royalty, the overriding royalty, and the combined working interest. The working interest portion of the lease is then allowed to subtract certain operating costs by one of three methods.

"There are three methods in which the *Guide* deducts operating costs from the working interest portion of the lease. Each expense methodology provides expenses allowances to account for operational costs. Kent testified there are different expense allowances based on different lease characteristics (location, field, well type, depth, production, and decline) is reasonable in the mass appraisal methodology and further takes these property characteristics of the lease into account.

"The first method is applying expense allowances from the appropriate *Guide* table. *Guide* table allowed expenses are direct, re-occurring expenses for specific depths discounted over a seven year period for Table C. The expenses listed in Table C ('Table C expenses') (as well as the *Guide's* equipment values discussed below) reflect averages and, therefore, may not compare directly to actual operating expenses experienced at individual wells. Table C expenses were determined for their *Guide* debut in 2006 and are modified annually by the PVD Director using his appraisal judgment and data from the U.S. Department of Energy's Energy Information Administration statistical expense study as well as the oil and gas industry.

"The second method that the *Guide* provides to account for expenses is for excess expenses. If a property's actual expenses discounted over the life of the appropriate table are at least 25% greater than the allowed table expense, excess expenses may be used as a second method of cost allowance. Excess operating expenses are based on normal re-occurring operating conditions, efficient operating practices, and prudent management discounted over the table economic lives, to reflect typical operating experience. The *Guide* provides what expenses are allowable for the purposes of the expense assignment.

27

"The third method of expense allowance is known as the 'working interest minimum lease value.' For gas leases, the *Guide* allows a maximum lease operating expense allowance of 90% of the working interest value to be deducted. If the applicable table expense allowance or the excess allowance together with the wellhead compression and salt water disposal ('SWD') expenses allowance is greater than 90% of the working interest value, then the Guide method uses an expense allowance of 90% of the working interest value. *Kent testified that the three methods of determining expenses have been developed together over time in conjunction with each other, and do not operate independently of one another*." (Emphasis added.)

This shows BOTA recognized the Guide's three income methods work together to arrive at fair market value, while the panel viewed the minimum lease value myopically for no reason apparent in the caselaw or the record. These findings also show BOTA appreciated that at several points in the Guide's calculations various accounting values are used instead of "actual" expenses, which underscores just how interrelated all parts of this valuation process are. The panel apparently favored some parts of the calculation, while dismissing others.

The point to this is that the panel gives no explanation, given the accounting values used elsewhere in the Rendition, why *as a matter of law* the working interest subtotal (Section VI, Line 5) represents "actual fair market value" for these low-producing working interests, while the minimum lease value is "an arbitrary value." *River Rock*, 58 Kan. App. 2d at 104. And as explained above, the evidence BOTA found credible established it is not an arbitrary value.

The Guide's methodology—including the minimum lease value provision—is the product of "expertise wielded by the Director of Property Valuation in adopting" it. *Bankoff*, 265 Kan. at 544. And its minimum lease value function represents PVD's

28

"appraisal opinion" that the gross working interest value does not accurately reflect fair market value of the reserve when the allowed expenses in the Guide's equation approach or exceed the Guide's production-value estimate for the working interest's share of production. This, of course, is an opinion BOTA expressly validated through its credibility determinations of the evidence in this record. But the panel's holding jettisons PVD's judgment that an interest in an operating gas lease has a value apart from the panel's simplistic deduction of Guide-defined allowable operating expenses from the Guide-devised reserve-value projection. So in addition to substituting PVD's appraisal opinion with its own, the panel's logic effectively creates a tax exemption for the gas reserves in marginally producing properties.

The panel's outcome means the working interest's share of natural gas reserves serviced by a gas well not currently producing or capable of producing in *profitable* quantities under present market conditions when using the Guide's approach to income and expenses is simply not taxable. This is an unsupported, judicially created notion contrary to our statute that requires wells producing or capable of producing "*in paying quantities*" to be "assessed *and taxed*" as personal property. (Emphases added.) K.S.A. 79-329. Said another way, in the panel's vision a lease's estimated unprofitability in any given year simply renders the working interest worthless and exempts it from ad valorem taxation except for the value of any well-site equipment—at least for that year.

Kent's testimony and BOTA's factual findings persuade us that the Guide's minimum lease value provision is consistent with accepted appraisal practices for this type of property, and calibrated to aid in determining the fair market value of a working interest in a marginally producing gas well. Moreover, the panel's decision to invalidate the Guide as a matter of law loses sight of how the valuation process here occurred because the county appraisers were always free to deviate from the Guide to achieve fair market value for River Rock's wells after finding just cause to do so. We hold the panel

erred when it concluded BOTA's use of the Guide constituted an improper application of the governing statutes under K.S.A. 77-621(c)(4).

This understanding also serves to reject the panel's reliance on K.S.A. 77-621(c)(7) to conclude BOTA's valuation determinations were erroneous because they were based on facts unsupported by the record. We fail to see any rationale for that conclusion. The counties valued the properties according to the Guide and had no basis to deviate from the Guide because River Rock submitted no well-specific information that would have supported an appraiser's "just cause" deviation to arrive at a different value as allowed under K.S.A. 79-1456(b). River Rock provided only limited material from the bankruptcy sale, which was long after the January 1 valuation date for the 2016 tax year, and River Rock later disavowed that information before BOTA as being relevant to establishing fair market value. So even that would not warrant judicial relief under K.S.A. 77-621(c)(7). Review of the entire record does not compel a conclusion that there was just cause to deviate from the Guide. Moreover, there is no showing BOTA disregarded undisputed evidence or showed bias in upholding the counties' valuations.

We hold River Rock fails to carry its burden of proving BOTA's decision was based on a factual determination unsupported by substantial evidence. See K.S.A. 77-621(a)(1) ("The burden of proving the invalidity of agency action is on the party asserting invalidity."), (c)(7); *Beech Aircraft Corp. v. Kansas Human Rights Comm'n*, 254 Kan. 270, 275, 864 P.2d 1148 (1993) ("[A] negative finding that a party did not carry its requisite burden of proof will not be disturbed on appeal absent proof of an arbitrary disregard of undisputed evidence or some extrinsic consideration such as bias, passion, or prejudice.").

Finally, we address the panel's holding that the Guide does not allow for proper reconciliation of market values when the working interest values and minimum lease

30

values "are so disparate." *River Rock*, 58 Kan. App. 2d at 105. The panel determined BOTA's decision in this regard contravened K.S.A. 77-621(c)(4) (erroneous interpretation or application of the law), (7) (agency action unsupported by record), or (8) (agency action otherwise arbitrary and capricious). 58 Kan. App. 2d at 107 ("The requirement to use the greater of the minimum lease value or the working interest subtotal [actual gross working interest value] strips the appraiser of the ability to reconcile the two values to determine a reasonable fair market value of the property.").

Most of what we have explained already dispels this last holding, but some additional points can be made. For example, the panel is simply wrong when it declares the Guide "strips" county appraisers' authority to deviate from it. *River Rock*, 58 Kan. App. 2d 98, Syl. ¶ 8, 106. The Guide does no such thing. State law expressly provides otherwise, and that provision is prominently noted in PVD's guidance documents in boldface. Adding to this, the county appraisers gave uncontroverted testimony that they understood their authority to deviate but had no basis upon which to exercise it because River Rock failed to supply well-specific information. But more fundamentally, the panel could only have relied on disputed portions of the record that were ultimately determined by BOTA to lack substantial credible evidence to make this declaration. Consider this passage from the panel:

> "As River Rock points out, the Uniform Standards of Professional Appraisal Practice (USPAP) guidelines describe reconciliation as a process in which the appraiser analyzes two different conclusions based on alternative valuation methods and weighs the appropriateness of each approach to determine the correct value based on the intended use of the appraisal. River Rock's citation to the USPAP guidelines is persuasive and well founded as USPAP appraisal methodologies have consistently been cited approvingly by Kansas appellate courts in the context of other ad valorem tax appraisals." 58 Kan. App. 2d at 105.

31

Kent, however, testified to the contrary, and BOTA accepted her testimony throughout its decision while discrediting River Rock's evidence. See K.S.A. 77-621(d) (when reviewing agency's factual determinations, "the court shall not reweigh the evidence or engage in de novo review"). She said:

> "I do not believe this general appraisal opinion that the working interest has a minimum market value, in addition to the remaining equipment, if the lease is producing, violates any applicable Uniform Standards of Professional Appraisal Practice (USPAP) provision."

So how did the panel decide to pick River Rock's interpretation of USPAP guidelines and go on to conclude that interpretation supports its decision to upend the Guide, when Kent's contrary view was accepted by BOTA? This, too, is unexplained other than perhaps by the panel's pejorative characterization of the Guide as reflecting "*an intent to produce a desired result*—always using the higher value, increasing the assessed value and the resulting ad valorem tax levied." (Emphasis added.) *River Rock*, 58 Kan. App. 2d at 106. But even that cynical view is unsupported by either the record that details the collaborative approach used to develop the Guide or our caselaw recognizing the complexities and validity of oil and gas valuation using PVD's methodology. The panel stepped outside its judicial review function to arrive at its conclusions. See *In re CIG Field Services Co.*, 279 Kan. 857, Syl. ¶ 2. The minimum lease value provision does not render the valuations arbitrary, and we accordingly hold the panel erred when it concluded River Rock met its burden to show entitlement for judicial relief under K.S.A. 77-621(c)(8).

To sum up, River Rock fails to meet its burden to prove BOTA's application of the Guide's minimum lease value provisions entitles it to judicial relief for any reason authorized by K.S.A. 77-621(c).

32

*BOTA's valuations for the equipment at the wells*

The panel rejected most—but not all—of River Rock's arguments about valuations given to its well equipment. Ultimately, the panel remanded to BOTA to remove valuations representing poly flow lines used to connect the gas wells to a separate saltwater disposal well (SWD). *River Rock*, 58 Kan. App. 2d at 110-11 ("If the value of the SWD flow lines was included in the working interest total market value [Line 10] BOTA's decision affirming the Counties' valuations of the subject wells was based on a finding of fact made or implied without proper support in the record and/or resulted from an arbitrary failure to consider undisputed evidence. Thus, whatever value was added for the SWD flow lines must be subtracted out and River Rock is entitled to relief under K.S.A. 77-621[c][7] and/or [8] by reducing the total equipment value.").

In its conditional cross-petition for review, River Rock asserts the panel erred by accepting the counties' remaining equipment valuations. In River Rock's view, those values are unsupported by the record. See K.S.A. 77-621(c)(7) (permitting relief from agency action when it is based on factual determination unsupported by substantial evidence). It also contends no party challenged the panel's ruling on the SWD lines, so that holding need not be considered by this court. But the counties' petition for review encompasses the SWD issue by broadly defending BOTA's use of the Guide's parameters on all issues. And in its oral argument before this court, PVD requested that BOTA's order and the Guide's equipment values be upheld. See Supreme Court Rule 8.03(i)(1) (2021 Kan. S. Ct. R. 54). In any event, we cannot review River Rock's equipment value issue without including the panel's conclusions on the SWD line since they are so intertwined.

River Rock's equipment valuation challenges relate to line items 8a and 8b of the gas rendition. Line 8a is used to report the value of equipment on producing well sites. Line 8b is used to report the value of equipment on non-producing well sites. The Guide directs the rendition preparer to use the equipment allowance set out in the tables that are used for appraising the producing equipment, surface and subsurface, "including casing, tubing, rods, pumping units, engines, tanks, separators, heater treaters, gun-barrel tank, meters, and lease lines." For coalbed methane fields, the Guide directs the rendition preparer to Table C.

The Guide also includes a matrix for equipment that prescribes a value based on well type (coalbed methane, temporarily abandoned, or SWD) and well depth. In addition, the Guide instructs the preparer for temporarily abandoned wells to itemize equipment if removal has begun. And it contains additional directions for SWD wells or systems. Kent's testimony about the equipment values, including SWD lines, was that

"[g]as table equipment value sections are used for appraising the producing equipment, surface and subsurface, including casing, tubing, rods, pumping units, engines, tanks, separators, heater treaters, gun-barrel tank, meters, and lease lines. All gas table equipment is determined to be at the end of its economic life based on table life, thus plugging and remediation expenses are removed from equipment values rather than in operating expense. The equipment values for all gas tables in the guide are created using new equipment cost values reduced by plugging and remediation expenses and depreciated to a salvage value. The salvage equipment value is then discounted to the end of the life of the table. The equipment values listed in Table C reflect averages; hence, direct comparison to individual wells will not reflect individual experience. (PVD Exhibit #4 Section VI Line 8a) In addition to a base well equipment value, Table C accounts for saltwater disposal (SWD) equipment values, again using averages based on depth. (PVD Exhibit #4 Section VI Line 8b) Table C equipment values were determined for the 2006 guide and modified through the years using the U.S. Department of Energy's, Energy

34

Information Administration's equipment value study, Kansas Corporation Commission plugging expense reports, and industry provided data."

River Rock vice president Allen testified on equipment values. He said River Rock had temporarily abandoned or plugged many wells and was plugging "a large number" of its remaining southwest Kansas wells. He noted as part of that process River Rock had "made a very extensive effort to sell the equipment associated with such wells." He said the prescribed equipment values for lines 8a and 8b were "substantially higher than the amount that we have been able to obtain for such equipment." He explained all the wells were drilled from the same formation and by the same company, so each of the "Subject Wells" would contain a "Size 16 pumping unit with a 5 hp motor; . . . [a] Gas separator; [a]pproximately 1,000 feet of production tubing and rods situated in the well bore; and . . . [an] insert pump situated in the well bore." Addressing the Table C equipment values, Allen's opinion was that

> "the prescribed equipment values in Table C are much too high for the Subject Wells because the above-described equipment actually has no value. In order to determine whether the equipment has any value, the down hole equipment must be pulled from the well and inspected to assess its condition and determine whether it has any market value at all.

> "Likewise, the surface equipment must also be disconnected from the well to attempt to make it marketable. *The costs incurred by River Rock to retrieve and/or disconnect the equipment and attempt to make it marketable has exceeded any potential sale price that River Rock has been able to obtain for such equipment*. More importantly however, River Rock has experienced extreme difficulty in finding any market for its equipment at any price. There is simply no market, or a limited market, for equipment removed from small, coal bed methane wells." (Emphasis added.)

35

And as to the equipment valued on line 8b, Allen testified,

"The equipment that is appraised in Line 8B of the Rendition form is the poly pipe saltwater flow line that extends from the wellhead to River Rock's saltwater disposal system. Like the other equipment discussed above, this equipment also has no value. It is simply a short, buried piece of poly pipe that serves no purpose other than transporting produced saltwater away from the well. This underground poly saltwater flow line is eventually abandoned in place, cannot be salvaged or sold for value, and does not generate any profit to the owner. Thus, this 'equipment' has no value."

Allen explained,

"This opinion is based upon actual sales and market conditions I have experienced in trying to sell this equipment on behalf of River Rock. When River Rock temporarily abandons a well prior to plugging the well, it typically removes the surface and subsurface equipment from the well. Often, River Rock seeks to immediately sell the equipment. For other wells, a decision is made to immediately plug the well in lieu of temporarily abandoning the well before subsequently plugging the well. Once again, the equipment is pulled and an effort is made to sell the equipment. As a result of River Rock's decision to plug and abandon a large number of unprofitable wells, I have made a very extensive effort to work with my team to sell the equipment associated with such wells and to obtain bids/offers for the sale of additional equipment as wells are plugged in the future. In fact, we have contacted every major vendor that I am aware of in southeast Kansas that I and my team believed might be willing to purchase this equipment. All but one of these vendors were unwilling to purchase this equipment for any cash price, and the vendor who did offer to purchase such equipment offered less than the cost to pull such equipment from the Subject Wells and transport it to market. Thus, the equipment clearly has no value."

But drawing largely from Kent's testimony, BOTA accepted the counties' equipment valuations. It explained,

"The *Guide'*s equipment values are determined using new equipment costs, reduced by plugging and remediation expenses, which are then depreciated to salvage value and subsequently discounted to the end of life of the *Guide* tables. Further *Guide* equipment values are designed to reflect averages and, therefore, direct comparison to individual wells may not reflect individual experience. *Guide* equipment values were determined for the 2006 *Guide,* and have been modified through the years using the U.S. Department of Energy, Energy Information Administration's equipment value study and industry provided data.

"[River Rock] indicated that it had solicited bids for the subject equipment from vendors with little interest. Moreover, [River Rock] stated that even if vendors would agree to purchase its equipment, the cost to remove the equipment would exceed the bid price. [River Rock] presented two letters from vendors in support thereof. The Board finds this scant evidence insufficient to persuade the Board that [River Rock's] opinions of value for either the equipment value or for the plugging and remediation costs are reflective of the market.

"The *Guide's* methodology for valuation of well equipment deducts plugging and remediation costs from the cost of the equipment when new. The Taxpayer proposes a valuation methodology for well equipment consisting of the equipment's current value less the Taxpayer's actual equipment recovery costs. The Taxpayer's proposed equipment valuation methodology it is akin to a 'value in use' methodology as it could result in equipment of identical type and age having vastly different values based on the equipment's use or situs. This would violate the Kansas statutory requirement that oil and gas property be appraised in a uniform and equal manner. K.S.A. 79-1439(a). Moreover, in regard to the gas well equipment value, the Board finds that the Taxpayer is not requesting a 'deviation' from the *Guide* provisions, but instead is proposing that the *Guide's* well equipment valuation formula be scrapped and replaced with its own. After review of the record evidence regarding the well equipment valuation dispute, again

37

> noting that the Taxpayer has the statutory burden of proof herein, the Board finds and
> concludes that River Rock's request to deviate from the *Guide's* valuation determinations
> of certain well equipment similarly lacks sufficient evidentiary support."

The Court of Appeals panel affirmed BOTA on all equipment values, except the SWD lines, because in its view "BOTA properly rejected River Rock's valuation on the basis the evidence presented was 'scant' and 'insufficient.' River Rock has not met its burden to prove BOTA's valuation of the equipment was improper except [regarding the SWD line]." *River Rock,* 58 Kan. App. 2d at 110. As to the SWD equipment, the panel concluded that property could not contribute to lease values because "River Rock presented *uncontested* evidence the flow lines connected to the SWD could not be physically salvaged without destroying them" and that the removal cost would exceed the lines' salvage value. (Emphasis added.) 58 Kan. App. 2d at 110.

But as previously discussed, the Guide values are binding on the working interest appraisal absent a taxpayer's evidence amounting to just cause to deviate from the Guide. Here, Kent's testimony shows how the Guide seeks to mass-appraise well-site equipment using typical industry scenarios. And its values for coalbed methane wells are tailored to account for differences based on well-depth and the circumstances of the well, e.g., whether it is producing, temporarily abandoned, or used as a SWD unit. The Guide's baseline values also permit the use of itemized values for temporarily abandoned wells when equipment removal has begun. So any contention that River Rock's equipment value evidence was "undisputed" is just wrong. The company's evidence simply disputed the counties' evidence that their valuations correctly applied the Guide. And when all the evidence is viewed in its appropriate perspective, we agree with the panel and BOTA that River Rock's generalized testimony—that did not pertain to specific well sites—cannot negate BOTA's reliance on the Guide's methodology. See K.S.A. 77-621(c)(7), (d).

38

This same insufficiency in River Rock's evidence exists about any line-item 8b valuations for well sites that might include SWD lines, so we disagree with the panel in that respect. The Guide values were "determined using new equipment costs, reduced by plugging and remediation expenses" and "depreciated to salvage value and subsequently discounted to the end of life of the Guide tables." Line item 8b reports values for equipment located on non-producing wells, which as a category includes those that are shut-in, those that are temporarily abandoned, and SWD wells or equipment.

Spread against the breadth of non-producing wells whose equipment is valued using line 8b, River Rock's evidence undergirding the panel's decision was simply Allen's blanket testimony that "[t]he equipment that is appraised in Line 8B of the Rendition form is the poly pipe saltwater flow line that extends from the wellhead to River Rock's saltwater disposal system." This testimony is questionable on its face given the several well types to which line 8b applies, and the question lingers because his testimony was not connected to any site-specific evidence applicable to the January 1 valuation date.

The quality of River Rock's evidence was inadequate to compel BOTA's deviation from the prescribed Guide values, as would be required for River Rock to obtain judicial relief under the KJRA. BOTA did not err in applying the Guide's equipment values.

*BOTA's failure to grant a fee abatement*

Finally, the counties seek review of the panel's conclusion that it had jurisdiction to address whether BOTA erred by refusing to abate River Rock's filing fees for the 205 properly docketed appeals and the remaining wells for which it did not pay fees. The panel held the issues were properly before it and remanded the case to BOTA for further explanation of its ruling.

39

Admittedly, this dispute seems to lose any practical significance given our decisions upholding BOTA's application of the Guide. River Rock presumably has nothing to gain by docketing the unpaid appeals just to lose on the merits. But there may be reasons not disclosed by the record, so River Rock can decide that for itself because we agree with the panel that it had jurisdiction to address the abatement and docketing issues.

During the BOTA proceedings, River Rock moved to consolidate its appeals and abate filing fees. It asserted the total BOTA filing fees for all the appeals would be cost-prohibitive at more than $327,000. The exhibit River Rock attached to its motion listed wells for which it had not paid fees that included properties in Allen, Montgomery, and Woodson Counties, which are not parties to this appeal, so to that extent the motion's full scope is an enigma.

River Rock requested that its perfected appeals be consolidated because they shared a common legal issue, i.e., whether the Guide is lawful. It argued consolidation would permit BOTA to avoid holding essentially the same hearing multiple times. River Rock also asked BOTA to abate filing fees for the paid-up appeals under K.A.R. 94-5-8(e)(2), since the $30,900 it had paid "far exceeds the costs and expenses which will be incurred by [BOTA] in processing the Appeals." It argued the remaining fees would be unreasonable and amount to an unconstitutional tax or revenue-raising measure. It also pointed out the motion was filed within 30 days of the appraisers' written notification of the informal meeting results.

In a brief order, BOTA granted consolidation of the appeals but denied River Rock's request for fee abatement, noting "it has consistently charged filing fees in the past." BOTA did not rule on whether it would construe the motion as a notice of appeal for the remaining wells, and River Rock did not remit filing fees for them after BOTA's

order. See K.A.R. 94-5-4(b) ("Except as provided in subsection [c], all notices of appeal and other pleadings shall be prepared on forms approved by [BOTA], signed by the party or the party's attorney, and filed with all information and supporting documentation requested in the forms. If a pleading is filed with insufficient information or is otherwise deficient, the pleading may be rejected by [BOTA] or may be accepted by [BOTA], with supplementation by the parties required by [BOTA].").

On appeal, River Rock argued BOTA erred by refusing to abate its filing fees and refusing to docket its remaining appeals. The counties argued there was no jurisdiction to review the fee abatement issue since BOTA's decision was a final order and River Rock did not timely petition for judicial review. The panel disagreed with the counties. It held the decision did not start the 30-day time limit to seek judicial review since the BOTA order "violated the final order notification provisions of K.S.A. 77-613(e)." *River Rock*, 58 Kan. App. 2d at 112; see also K.S.A. 77-613(e) ("Unless reconsideration is a prerequisite for seeking judicial review, a final order shall state the agency officer to receive service of a petition for judicial review on behalf of the agency.").

On the merits, citing its standard of review under K.S.A. 77-621(c)(4) and (5), the panel remanded the fee abatement question to BOTA for a more robust explanation of its reasoning, while cautioning that excessive fees could comprise an illegal tax. 58 Kan. App. 2d at 111. And regarding the appeals for which River Rock did not pay the filing fees, the panel noted that while BOTA denied fee abatement, it did not rule clearly on whether it would docket and consider the additional appeals. In the panel's view, BOTA's order "could reasonably be construed that BOTA would docket the additional appeals but decline to grant any abatement of the filing fees already paid by River Rock as a result." 58 Kan. App. 2d at 113. The panel also suggested that if fee abatement were granted, the fees already paid could cover some portion of the remaining appeals. See 58 Kan. App. 2d at 114 ("Strictly following K.A.R. 94-5-8[e][2], the filing fees River Rock paid could

41

have covered appeals for some, but not all, of its additional wells."). And the panel reasoned,

> "If BOTA's decision turned on a conclusion that it lacked jurisdiction to consider River Rock's additional appeals, then we have subject matter jurisdiction to review BOTA's conclusion as to its own jurisdiction. But BOTA's findings in its consolidation order and its final opinion are insufficient to determine whether its decision hinged on a jurisdictional determination. Thus, we remand for more findings before BOTA for what remedy, if any, BOTA has to address River Rock's request for abatement. [Citation omitted.]" 58 Kan. App. 2d at 114.

The counties sought our review of the panel's decision that there was jurisdiction to entertain River Rock's fee abatement claims for the remaining appeals. In their view, BOTA's pre-docketing rejection of the remaining appeals was, by its very nature, a final agency action. They argue the matter was final because those appeals were no longer under "active consideration," by virtue of not being docketed, citing *Guss v. Fort Hays State Univ.*, 38 Kan. App. 2d 912, 917, 173 P.3d 1159 (2008). And this, they continue, occurred either when BOTA gave its notice assigning docket numbers only to the paid-up appeals, "or at the very latest after receiving BOTA's order consolidating the 205 docketed appeals." The counties also suggest the final agency action at issue is in the nature of agency inaction—not docketing the appeals—which would typically begin the 30-day review clock. See K.S.A. 77-613(d) (providing petition for judicial review of agency action other than rule, regulation, or final order generally must be filed within 30 days).

As noted, the status of these remaining appeals may be of little practical importance going forward; but we agree the panel had jurisdiction to address River Rock's fee abatement issue. Under the Kansas Administrative Procedure Act, a final order or initial order

42

"shall . . . include a statement of the available procedures and time limits for seeking reconsideration, administrative review or other administrative relief. An initial order shall include a statement of any circumstances under which the initial order, without further notice, may become a final order. . . . Any final order, for which a petition for reconsideration is not a prerequisite for seeking judicial review, and any initial order, for which further administrative review is not available, shall state the agency officer to receive service of a petition for judicial review on behalf of the agency." K.S.A. 77-526(c).

And the KJRA similarly requires that "[u]nless reconsideration is a prerequisite for seeking judicial review, a final order shall state the agency officer to receive service of a petition for judicial review on behalf of the agency." K.S.A. 77-613(e). "The notice provisions of K.S.A. 77-613(e) require strict compliance." *Reifschneider v. State*, 266 Kan. 338, 342, 969 P.2d 875 (1998). And "[t]he 30-day period for filing a petition for judicial review under . . . K.S.A. 77-613(b) begins to run 'after service of the order' by the agency in compliance with the notice requirements in K.S.A. 77-613(e)." 266 Kan. at 343.

In *Reifschneider*, the court held that although an agency's claim-denial letter was a final agency action, the 30-day time limit for judicial review never started because the letter did not comply with the notice requirements. The letter's deficiencies included failing to identify the agency officer to receive service of a petition for judicial review. 266 Kan. at 342-43. In *Guss*, the case the counties cite for support, a Court of Appeals panel explained that failure to strictly comply with K.S.A. 77-613(e) "does not render the document something other than a final order; rather, it simply tolls 30-day period for the filing of a petition for judicial review." *Guss*, 38 Kan. App. 2d at 917.

43

River Rock requested that its fee abatement motion be construed as a notice of appeal for the wells for which it had not yet paid filing fees and asked BOTA to abate the fees. Here, BOTA affirmatively acted. Its order resolving River Rock's motion must be the relevant agency action upon the notice of appeal and filing fee requests for review purposes. The order's recitation of only 205 docket numbers, together with BOTA's refusal to abate fees must be understood as a determination that, at a minimum, the additional appeals would not be docketed without the payment of the associated filing fees. That determination was done by order, not by BOTA's failure to act.

In any event, we will assume without deciding that BOTA's order denying the motion was a final agency action. But even so, as the panel correctly noted, the order's failure to comply with the K.S.A. 77-613(e) notice requirements tolled the time to seek judicial review. We hold River Rock's petition for judicial review was timely for the fee abatement issues. And since the counties do not substantively challenge the panel's directions on remand that BOTA more fully explain its decision regarding all the appeals, we will not comment on their propriety.

Judgment of the Court of Appeals affirming in part and reversing in part the Board of Tax Appeals and remanding the case with directions is affirmed in part and reversed in part. Decision of the Board of Tax Appeals is affirmed in part and reversed in part, and the case is remanded with directions.

# TABLE

**GAS ASSESSMENT RENDITION**
Schedule 2 (Class 2B) (Rev. 12/15)

**SHALL BE FILED WITH THE COUNTY APPRAISER BY APRIL 1**
_____ County, Kansas

| | |
|---|---|
| **Statement of** _____ | **Operator ID#** _____ **Tax Year** _____ |
| **P.O. Address** _____ **City** _____ | **State** _____ **Zip** _____ |
| **Name of Property** _____ **County ID#** _____ | **KDOR ID#**(s) _____ **Well API#**(s) _____ |

| **Section I-Location of Property** (required) | | **Section VII-Abstract Value** (for county use only) | | | |
|---|---|---|---|---|---|
| Lease Description | | | Appraised | Assessed | Penalty | Total |
| (Well location pg 2) | Total Working Interest (Sec. VI. Line 10) | | | | |
| Lot Sec. _____ Adn. Twp. _____ | Royalty & ORRI Interest (Sec. VI. Line 1) | | | XXXXXXXXX | |
| Blk Rng. _____ Twp. City _____ | Itemized Equipment (Sec. VI. Line 9) | | | | |
| Tax Unit _____ School Dist _____ | Total | | | | |

### Section II-Well Data (required)

| | | | |
|---|---|---|---|
| Producing Well: Pump  Flow | Non-Producing Well: Shut-In  SWD  TA | Bbls Water per Day ___ Ave Prod Depth ___ | SWD Depth ___ |
| Producing Field Name | BTU Content | Spud Date: Mo/Yr(new prod)  Comp Date: Mo/Yr(new prod) | Total WI Decimal |
| ( )Infill ( )Commingled ( )CBM ( )Horizontal  Total Depth Horizontal | | Lease Name/Number Tie (See Notation/Fg 2) | Total RI&ORRI Dec |
| Water Disposal: Hauler/System/Well Name | ( ) SWD System | Prior Yr Gross Weighted Ave $/Mcf (Adjusted for BTU Content) | |
| Address | Phone | Less Allowable Deductions $/Mcf (Gathering, Transportation, etc...) | |
| Gatherer Name | | Effective Jan 1 Net Price $/Mcf (Prior Yr Net Weighted Ave Price $/Mcf) | |
| Address | Phone | Effective Jan 1 Net Price $/Mcf to Royalty Owner | |

### Section IV-Production Data (required) / Notation

| Year | | Cond(Bbls) | Gas(Mcf) | Decline Rate:  ___ % |
|---|---|---|---|---|
| 2011 | Annual Production | | | |
| 2012 | Annual Production | | | |
| 2013 | Annual Production | | | |
| 2014 | Annual Production | | | |
| 2015 | Annual Production | | | |
| Total Production (5 yr cumulative) | | | | |
| Annual Production (Prior Yr) | | | | |
| Condensate (Converted to Mcf) | | XXXXXXXXX | | |
| Total Annual Production (Mcf + condensate conversion) | | | | |

**Condensate Production Data** (conversion calculation)

_____ X _____ = _____ / _____ = _____

Prod (Bbls)  X  Net $/Bbl Oil  =  Income  /  Net $/Mcf Gas  =  Total Mcf (cond conv)

| **Section V-Gross Reserve Calculation** (Total 8/8ths Interest) | Schedule (A) | Owner (B) | Appraiser (C) |
|---|---|---|---|
| 1.  Annual Production - Mcf (Total Annual Prod Sec IV) | | | |
| 2.  Effective Jan 1 Net Price $/Mcf (Sec II)  $___ X market adjust factor ___ adj inc/dec | | | |
| 3.  Estimated Gross Income Stream (Multiply Line 1 X Line 2) | | | |
| 4.  Present Worth Factor (Based on Decline Rate-Apply Appropriate Table PWF) | | | |
| 5.  Estimated Gross Reserve Value (Total 8/8ths - Multiply Line 3 X Line 4 - Transfer Total to Section VI, Lines 1 & 2) | | | |

| **Section VI-Gross Reserve Value X Decimal Interest** | Schedule (A) | Owner (B) | Appraiser (C) |
|---|---|---|---|
| 1.  Royalty & Overriding Royalty Interest Valuation (Total Sec V, Line 5 X Total RI & ORRI Interest)  X | | | |
| 2.  Working Interest Valuation (Total Sec V, Line 5 X Total WI Interest)  X  X  (Tbl B Water Cr Adj) | | | |
| 3.  Deduct Operating Cost Allowance for Producing Well (Allowance per Tbl) | | | |
| 4a. Deduct Wellhead Compression (Annual Compression Expense)  X  (Expense Factor-Tbl) | | | |
| 4b. Deduct Water Expense Allowance (Tbl A Annual Exp; Tbl B Annual Exp if Actual)  X  (Expense Factor-Tbl) | | | |
| 4c. Deduct Water Expense Allowance Table C per SWD Well (Deduct SWD Expense for each Prod Well if SWD System) | | | |
| 5.  Working Interest Subtotal (Sec VI, Line 2 minus Lines 3, 4a,4b & 4c) | | | |
| 6.  Working Interest Minimum Lease Value (Sec VI, Line 2)  X  10% | | | |
| 7.  Copy Value from Sec VI, Line 5 or Line 6 (Whichever Line is Greater) | | | |
| 8a. Add Prescribed Equipment Value for Producing Well (Flowing $/Well)  (Pumping $/Well) | | | |
| 8b. Add Prescribed Equipment Value for Non-Producing Well (Shut-In, TA,SWD-Add SWD Equip Value for each Prod Well if SWD System) | | | |
| 8c. Add Pres Equip Value for Additional Equipment (Compressors,Gathering Lines,etc...)  X  (Equip Fact-Tbl) | | | |
| 9.  Add Itemized Equipment (Section III - Attached Schedule) | | | |
| 10. Working Interest Total Market Value (Add Sec VI, Lines 7, 8a, 8b, 8c, & 9) | | | |
| 11. Working Interest Total Assessed Value (Multiply Sec VI, Line 10 X 30%, Unless Lease Qualifies for 25% Rate) | | | |

**Current Division Order with Name, Address, Interest of Royalty Owners, and Well/Lease Identifier is a Required Attachment to Rendition**

Certification:  I do hereby certify that this schedule contains a full and true list of all personal property owned or held by me subject to personal property taxation under the laws of the State of Kansas pursuant to K.S.A. 79-329 through 79-333.

| Owner | Date | Tax Rendition Preparer | Date |
|---|---|---|---|
| Rendition Information:  Contact Phone ( ) - | | Contact Email @ | |
| Lease Code _____ | County Code _____ | Lease Name _____ | |

Prescribed by Kansas Department of Revenue, Division of Property Valuation

000072